IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| YOUNG ADVOCATES FOR FAIR EDUCATION, <br><br>               Plaintiff, <br><br> v. <br><br> ANDREW CUOMO, in his official capacity as Governor of the State of New York, <br> BETTY ROSA, in her official capacity as Chancellor of the Board of Regents of the State of New York, <br> MARYELLEN ELIA, in her official capacity as Commissioner of the New York State Education Department, <br><br>               Defendants. | **BRIEF OF AMICI CURIAE IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** <br><br> Case No. 18-CV-4167 (ILG) (JO) |

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE ................................................................. vi

PRELIMINARY STATEMENT .................................................................... 1

BACKGROUND ......................................................................................... 3

    A.   New York's Compulsory Education Regime ............................ 3

    B.   The State's Limited Power To Intrude On The Parent-Child Relationship ............................................................................. 3

    C.   Section 3204's "Substantially Equivalent" Requirement ......... 5

    D.   The Felder Amendment To Section 3204 ................................. 7

    E.   YAFFED's Baseless Criticisms Of Yeshiva Education ............ 8

    F.   The Common Core And Next Generation Standards ............... 10

    G.   YAFFED's Challenge To The Felder Amendment .................. 10

ARGUMENT .............................................................................................. 11

  I.   YAFFED WILL NOT SUFFER IRREPARABLE HARM ................. 11

  II.   NEITHER THE BALANCE OF EQUITIES NOR THE PUBLIC INTEREST FAVOR A PRELIMINARY INJUNCTION .................. 13

  III.   YAFFED CAN NOT PREVAIL ON THE MERITS .......................... 13

    A.   YAFFED Urges The Court To Adopt A Rule That Would Violate The Free Exercise Clause.......................................... 14

       1.   A Rule Prohibiting The State From Even Considering The Secular Benefits Of A Jewish Studies Curriculum Violates The Free Exercise Clause............................................. 15

       2.   A Rule Prohibiting The State From Even Considering The Secular Benefits Of A Jewish Studies Curriculum Would Exceed The State's Limited Power To Regulate Religious Schools ..................................................................... 17

    B.   The Felder Amendment Does Not Violate The Establishment Clauses ................................................................................... 18

       1.   There Is No Constitutional Prohibition On Providing An Accommodation Exclusively To Religious Groups .................... 19

       2.   Removing A Government-Imposed Burden On Religious Practice Is A Classic And Accepted Accommodation................. 20

    C.   The Felder Amendment Does Not Violate The Lemon Test .................. 20

       1.   The Felder Amendment Has A Secular Purpose ........................ 21

2. The Primary Effect Of The Felder Amendment Is Not to "Advance" Religion ................................................................... 21

3. There Is No Excessive Entanglement With Religion .................. 23

CONCLUSION ............................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

ACLU v. Clapper,
　804 F.3d 617 (2d Cir. 2015).................................................................11

Agostini v. Felton,
　521 U.S. 203 (1997)...............................................................23, 25

Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla,
　490 F.3d 1 (1st Cir. 2007)............................................................18

Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,
　457 U.S. 853 (1982)................................................................17

Blackwelder v. Safnauer,
　689 F. Supp. 106 (N.D.N.Y. 1988).....................................................3, 6

Bronx Household of Faith v. Bd. of Educ. of City of New York,
　331 F.3d 342 (2d Cir. 2003)........................................................11, 12

Brown v. Gilmore,
　258 F.3d 265 (4th Cir. 2001) ........................................................21

Cent. Rabbinical Congress v. New York city Dep't of Health & Mental Hygiene,
　763 F.3d 183 (2014)................................................................15

Church of Lukumi Babalu Aye v. City of Hialeah,
　508 U.S. 520 (1993)................................................................15

Citibank, N.A. v. Citytrust,
　756 F.2d 273 (2d Cir. 1985).........................................................12

Commack Self-Serv. Kosher Meats, Inc. v. Hooker,
　680 F.3d 194 (2d Cir. 2012).........................................................24

Cooper v. U.S. Postal Serv.,
　577 F.3d 479 (2d Cir. 2009).........................................................20

Corp. of Presiding Bishop of the Church of Latter-Day Saints v. Amos,
　483 U.S. 327 (1987)................................................................20

Cutter v. Wilkinson,
　349 F.3d 257 (2003)................................................................19

*Cutter v. Wilkinson*,
   544 U.S. 709 (2005).......................................................................................19, 20

*Employment Division v. Smith*,
   494 U.S. 872 (1990)...............................................................................................15

*Farrington v. Tokushige*,
   273 U.S. 284 (1927)...............................................................................................17

*Fraternal Order of Police Newark Lodge No. 12 v. Newark*
   170 F.3d 359 (1999)...............................................................................................16

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
   13 F. Supp. 2d 417 (S.D.N.Y.1998).......................................................................13

*Jones v. Wolf*,
   443 U.S. 595 (1979)...............................................................................................24

*Larkin v. Grendel's Den, Inc.*,
   459 U.S. 116 (1982)...............................................................................................25

*Leebaert v. Harrington*,
   332 F.3d 134 (2d Cir. 2003)...................................................................................16

*Lemon v. Kurtzman*,
   403 U.S. 602 (1971)..................................................................................20, 21, 23, 25

*Locke v. Davey*,
   540 U.S. 712 (2004)...............................................................................................18

*Meyer v. Nebraska*,
   262 U.S. 390 (1923)............................................................................................4, 5

*N.J. v. New York*,
   872 F. Supp. 2d 204 (E.D.N.Y. 2011) ...................................................................13

*Packer Collegiate Inst. v. Univ. of State of New York*,
   298 N.Y. 184 (1948)..............................................................................................17

*Pierce v. Society of Sisters*,
   268 U.S. 510 (1925)................................................................................................4

*State v. Whisner*,
   47 Ohio St. 2d 181 (1976)......................................................................................17

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   137 S. Ct. 2012 (2017)...........................................................................................18

*Wallace v. Jaffree*,
    472 U.S. 38 (1985)..............................................................................21

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)......................................................................1, 5, 16

*Zobrest v. Catalina Foothills Sch. Dist.*,
    509 U.S. 1 (1993)................................................................................22

*Zorach v. Clauson*,
    343 U.S. 306 (1952)............................................................................19

**Statutes, Rules and Other Authorities**

N.Y. Educ. Law § 3204(2)..........................................................................6

N.Y. Educ. Law § 3204(2)(ii).................................................................7, 8

N.Y. Educ. Law § 3204(2)(iii).....................................................................8

N.Y. Educ. Law § 3204(2)(v).......................................................................8

N.Y. Educ. Law §§ 3205(1), 3212(2)(b) ....................................................3

N.Y. Educ. Law § 3233 ...............................................................................3

N.Y. Comp. Codes R. & Regs. tit. 8, § 100(c) .......................................16

N.Y. Comp. Codes R. & Regs. tit. 8, § 100.1(a) ....................................16

N.Y. Comp. Codes R. & Regs. tit. 8, § 175.21 .........................................6

Religious Land Use and Institutionalized Persons Act.......................19, 20

Elsa Haas, "How the Homeschool Regulations Really Work: Practical Nuances of
    the New York State Regulations on Home Instruction," Partnership for
    Accurate Homeschooling Information (Feb. 2013), https://pahsi.net/nys-
    regulations/....................................................................................6

http://www.businessinsider.com/what-its-like-to-attend-alternative-high-school-
    2015-3 ...........................................................................................7

http://www.p12.nysed.gov/psc/startcharter/rfpfaq2017.pdf ......................7

https://www.brooklynfreeschool.org/about/ ..............................................7

# INTERESTS OF AMICI CURIAE

*Amici curiae* are four advocacy organizations that have a deep interest in Orthodox Jewish life and the role yeshiva education plays in sustaining, preserving and growing the Orthodox Jewish community; in the children who are educated at yeshivas; and the rights of parents who choose to enroll their children in yeshivas.

- **Parents for Educational and Religious Liberty in Schools (PEARLS):** PEARLS is a non-profit organization based in Brooklyn, New York. Its mission is to protect the fundamental right of parents to choose a yeshiva education for their children, and to facilitate the preparation and implementation of a uniform secular studies curriculum that is both Common Core compliant and culturally sensitive to the values of yeshiva students. Altabe Decl. ¶ 3. To advance that mission, PEARLS has undertaken a public education campaign, and coordinated the creation of curricular materials that are in use at many yeshivas. Altabe Decl. ¶¶ 3-9.

- **Agudath Israel of America:** Agudath Israel was founded in 1922, and is a national Orthodox Jewish organization headquartered in New York, with offices, chapters, affiliated synagogues and constituents across North America. Agudath Israel has been at the forefront of advocacy on behalf of Orthodox Jewish interests and rights, perhaps most significantly on behalf of the broad Orthodox Jewish school community, and has been active in legislative bodies, executive agencies and judicial forums on a wide array of issues affecting that community.

- **Torah Umesorah: National Society for Hebrew Day Schools:** Torah Umesorah serves as the pre-eminent support system for Jewish Day Schools and yeshivas in the United States, providing them with a broad range of services. Its membership consists of over 675 day schools and yeshivas with a total student enrollment of over 200,000 students.

- **United Jewish Organizations of Williamsburg (UJO)**: The UJO was formed by Chasidic survivors of the Holocaust who had emigrated to the United States and reestablished their communities in Williamsburg. These new communities joined together to form the UJO to represent their needs and to protect their right to maintain their traditional culture and lifestyle. The UJO was incorporated in 1966 to serve as a unified voice for the Chasidic community. While it is now a premier social service provider to those communities, it continues to work for the protection of the traditional practices of the Williamsburg Jewish community.

The *Amici* all share a concern about the negative religious liberty implications of this lawsuit and the injunction against the amendment to the Education Law requested by YAFFED.

Orthodox Jewish parents choose yeshiva education for their children to fulfill the Biblical injunction that "You shall place these words of Mine upon your heart and upon your soul . . . and you shall teach them to your children to speak in them." Deuteronomy 11:18-19. The Bible says of Abraham, "I have known him because he commands his sons and his household after him, that they should keep the way of the Lord." Genesis 18:19.

Professor Jack Wertheimer has commented on the extent to which Jewish schools have become the vehicle through which Jewish parents transmit religious values to their children:

> The day schools of the 20th century are unique, however, in the mission they have been assigned . . . . Up to the middle of the 20th century, it was widely assumed by Jews of all stripes that Jewishness was something almost innate, and no school was needed to inculcate it . . . . The inability of families to play their accustomed roles and the collapse of ethnic neighborhoods necessitated the creation of a new type of day school movement.

Twerski Decl. ¶¶ 4-8.

While parents choose yeshiva education to fulfill a religious mission, their ability to do so vindicates an important secular right – the fundamental right that has been repeatedly invoked by the United States Supreme Court to strike down state attempts to limit parental freedom to direct how their children are educated. In *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972), the Supreme Court recognized that parents have "fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children."

Today, those rights are not being challenged by the State. Instead, critics of the Chasidic way of life are attempting to usurp that parental prerogative under the guise of a concern that their children will not receive "the critical tools and skill sets needed for long-term personal growth."

Compl. ¶ 5.  It has apparently not occurred to those who have established YAFFED that Chasidic parents utilize a different barometer than theirs for measuring a meaningful and successful life.

In this lawsuit, YAFFED seeks a preliminary injunction against a recent amendment to New York's compulsory education law, alleging that it "frustrates the mission of YAFFED." Compl. ¶ 15.  Would that YAFFED have as much concern about frustrating the mission of the Legislature, which duly enacted the amendment, or the goals of the tens of thousands of parents who each year choose yeshiva education for their children.

In the end, what is fatal to YAFFED's lawsuit and its motion for a preliminary injunction is not its self-reverence but its inability to point to any aspect of the amendment that dispositively departs from lawful education policy.  YAFFED alleges that the long school day that is an element of the amendment applies exclusively to yeshivas.  It is unclear how YAFFED knows that, but even if it were so, it is an odd criticism of a compulsory education law that it takes into account and credits a long school day.  The amendment explicitly mandates instruction in Math, English, History (which encompasses geography, economics and civics) and Science for elementary school students, and requires a "sound basic education" – the constitutional standard in New York – for high school students.

The amendment also directs consideration of "the entirety of the curriculum" that is being taught to the students.  But why would a compulsory education law ignore "the entirety of the curriculum?"  As demonstrated below, YAFFED fundamentally misunderstands how the Common Core and Next Generation Learning Standards operate and what they require if it believes that considering "the entirety of the curriculum" is an innovation of this amendment.  It is not.

 Perhaps most importantly, in enacting the amendment the Legislature did not direct any specific conclusion with respect to the "entirety of the curriculum."  It merely required that it be

considered, and left it to the State Education Department (SED) to determine compliance. But instead of allowing SED to do its job, YAFFED – having waited five months since the enactment of the amendment before seeking relief – now asks this Court to enjoin SED from issuing any guidance on the amendment on the basis of speculation about what that guidance might say.

YAFFED cloaks its disappointment with the Legislature that enacted the Felder Amendment in constitutional garb, but there is nothing in the law that prohibits consideration of the "entirety of the curriculum." To the contrary, the Free Exercise Clause requires it. As the only federal court to analyze the substantial equivalence aspect of New York's compulsory education law concluded, it is "flexible enough to allow local school officials sufficient leeway to accommodate the special requirements of diverse religious groups without sacrificing the vital state interests at issue." *Blackwelder v. Safnauer*, 689 F. Supp. 106, 135 (N.D.N.Y. 1988).

YAFFED's request for a preliminary injunction should be denied.

## BACKGROUND

### A.      New York's Compulsory Education Regime

New York's compulsory education law requires parents to provide their school-age children with "full-time instruction." *See* N.Y. Educ. Law §§ 3205(1), 3212(2)(b). Any violation of that command risks criminal sanctions, including imprisonment. *See* N.Y. Educ. Law § 3233.

### B.      The State's Limited Power To Intrude On The Parent-Child Relationship

New York's compulsory education authority is, of course, cabined by constitutional protections that limit the state's power to intrude on parents' fundamental right to control the education and upbringing of their children. Those constitutional protections have long been recognized in a series of United States Supreme Court decisions striking down limitations on that parental authority.

*Meyer v. Nebraska*, 262 U.S. 390 (1923), dealt with an appeal brought by a teacher who was convicted of the crime of teaching German to a child in a Lutheran elementary school. That instruction ran afoul of a Nebraska statute that prohibited teaching of any modern foreign language to any child who had not yet passed the eighth grade. Overturning the conviction, the Court held that the statute violated not only the teacher's constitutional rights, but the rights of the child's parents as well: "[The teacher's] right thus to teach [the German language] and the right of parents to engage him so to instruct their children, we think, are within the liberty of the [Fourteenth] Amendment." *Id.* at 400. This conclusion rested upon the Court's broad understanding of individual liberty, *id.* at 399, and not on religious rights.

Two years later, in *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925), the Court again addressed the tension between state regulation and parents' rights to control the education of their children. *Pierce* involved an Oregon law making it a crime for parents not to send their children to public schools. Although the law provided exemptions for parents who provided their children private instruction approved by the county superintendent, the Supreme Court held it was unconstitutional: "[W]e think it entirely plain that the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Id.* at 534-35. As the Court then went on to explain: "The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at 535.

Although both *Meyer* and *Pierce* arose in the context of private, religious schools, neither case was decided under the Free Exercise Clause. Instead, both involved the fundamental constitutional right of parents to direct the education and upbringing of their children. That right, which is substantial even in a secular context, becomes even more inviolate when coupled with a

practice implicating the free exercise of religion. Just such a case reached the Supreme Court in *Wisconsin v. Yoder,* 406 U.S. 205 (1972).

*Yoder* involved a claim by Old Order Amish parents that they should be exempt from Wisconsin's compulsory education law. The parents refused to send their children to school past the eighth grade because they believed that high school attendance would conflict with the religious values they sought to impart to their families. In addressing that claim, the Supreme Court first examined the Amish faith and concluded that the regulation at issue burdened the Amish in their free exercise of religion: "[E]nforcement of the State's requirement of compulsory formal education after the eighth grade would gravely endanger if not destroy the free exercise of [Amish] religious beliefs." 406 U.S. at 219. The Court then explained the standard that must be applied in determining whether, given that burden, the Amish were entitled to an exemption: "A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion." *Id.* at 220.

*Yoder* held that the compulsory education requirement was unconstitutional as applied to the Amish, who had "demonstrated the sincerity of their religious beliefs, the interrelationship of belief with their mode of life, the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization, and the hazards presented by the State's enforcement of a statute generally valid as to others." *Id.* at 235

### C.    Section 3204's "Substantially Equivalent" Requirement

Consistent with its limited power to intrude on parents' fundamental right to control the education and upbringing of their children, New York's compulsory education scheme does not require parents to send their school-age children to public schools. Nor does it rigidly prescribe the mode or method of instruction that parents who choose private schools must arrange for their children. Instead, since at least 1894, parents have only been required to provide their school-age

children with instruction that is – as Section 3402 now provides – "substantially equivalent" to the instruction they would receive in their local public school.  *See* N.Y. Educ. Law § 3204(2);

Moreover, as the *Blackwelder* court recognized, not only is the substantial equivalent requirement "flexible enough to allow local school officials sufficient leeway to accommodate the special requirements of diverse religious groups," 689 F. Supp. at 135, it is also not so rigid as to impose a single standard across the State or the City.  Rather, "the guidelines supplied by the state legislature provide a basic framework within which local authorities can fashion educational standards designed to address peculiar local concerns.  The scope, depth, and emphasis of the instruction that is required varies from district to district."  *Id.* at 127.

Consistent with that approach, educational authorities have created and approved numerous paths to satisfy the substantial equivalence standard that do not mirror the local public school instruction but in fact deviate substantially from it.  In this way, the substantial equivalence requirement has been tailored for those in unique and non-traditional educational settings.

- **Home-School Instruction.**  All parents in the State have the option of home schooling their children.  While there are regulations that loosely govern home schooling, in the actual home school experience the strict hours and courses requirements are simply a formality because self-instruction is counted toward the hours and parents may meet the substantial equivalence requirement merely by stating that they intend to meet regulatory requirements by providing materials which their child can choose to engage with. In New York City, parents have refused to commit to time requirements without objection by the Department of Education.  *See* Elsa Haas, "How the Homeschool Regulations Really Work: Practical Nuances of the New York State Regulations on Home Instruction," Partnership for Accurate Homeschooling Information (Feb. 2013), https://pahsi.net/nys-regulations/.

- **Homebound instruction.**  The New York State Education Department has issued regulations for "homebound" instruction – i.e., instruction when a pupil is unable to attend school due to medical reasons.  Under the regulations, homebound elementary school students are only required to have five hours of instruction per week, and homebound high school students are only required to have ten hours of instruction per week.  *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 175.21.

- **Charter Schools.** The New York State Education Department has noted, that a "charter school is subject to the same health and safety, civil rights, and student assessment requirements as other public schools, but is exempt from all other State and local laws, rules, regulations, or policies governing public or private schools, other than the provisions of the Charter Schools Act." *See* http://www.p12.nysed.gov/psc/startcharter/rfpfaq2017.pdf

- **City-As-School Instruction.** The New York State Department of Education allows some schools to provide only two days of instruction per week, so long as students spend three days a week interning at local businesses. *See* http://www.businessinsider.com/what-its-like-to-attend-alternative-high-school-2015-3

- **Part-time, Evening and Parental Schools.** Section 3204(3) provides a series of looser standards for part-time day schools ("such subjects as will enlarge the civic and vocational intelligence and skill"); evening schools ("at least speaking, writing and reading English") and parental schools ("vocational training and for instruction in other subjects appropriate to the minor's age and attainments").

- **Free Schools.** There are numerous models of schools in New York State that use non-traditional methods of students learning and skill development, including Democratic Free Schools and Agile Learning Centers, among others. In these schools, no standard curriculum is followed. Instead, students are expected to take responsibility for designing and achieving their own learning goals. Students decide when they want to learn, what they want to learn, and how they want to learn. The schools ascribe to the belief that learning occurs naturally, and, thus, explicit teaching of what is traditionally seen as the basics of education is unnecessary. *See* https://www.brooklynfreeschool.org/about/ ("There is no one way to learn at Brooklyn Free School. Our students are challenged and supported by a community of self-directed learning. At BFS we have no standardized curriculum, no mandatory testing, and no grading. Our teachers work with students to develop curriculum that supports their passions and their growth, and our lessons leap out of the classroom and into our neighborhood, city, and wider world. Our curriculum fosters self-confidence and self-motivation, as students learn that they are equal partners in determining their educational paths."). These schools are approved by the New York State Education Department.

### D. The Felder Amendment To Section 3204

The Felder Amendment applies to all private schools – religious or secular – that are non-profit corporations, have a bi-lingual education program, and offer an extended school day. *See* N.Y. Educ. Law § 3204(2)(ii).

For elementary and middle schools that meet the criteria, the Felder Amendment provides that assessing their substantial equivalence requires consideration of, *among other things*, whether

"the entirety of the curriculum" provides "academically rigorous instruction that develops critical thinking skills" and includes instruction in English, Math, History (including geography, economics and civics) and science. *See* N.Y. Educ. Law § 3204(2)(ii).

For high schools, the Felder Amendment provides that assessing their substantial equivalence requires consideration of, *among other things*, whether "the entirety of the curriculum" provides "academically rigorous instruction that develops critical thinking skills" and provides a "sound basic education." *See* N.Y. Educ. Law § 3204(2)(iii). The "sound basic education" standard is not a construct of the Legislature, but has been the subject of extensive commentary and discussion by the New York Court of Appeals.

The Felder Amendment also provides that the Commissioner of SED is tasked with determining compliance with the substantial equivalence requirement. N.Y. Educ. Law § 3204(2)(v). Consistent with its broad regulatory authority, there is nothing that prevents the Commissioner from delegating that authority to local school districts.

Importantly, the Felder Amendment (1) does not exempt any private school from complying with the substantial equivalence requirement; and (2) does not prohibit the New York State Department of Education from issuing regulations requiring the private schools that fall within the scope of the amendment to teach secular subjects. Nor does it prohibit SED or any local school board from applying its standard when assessing the substantial equivalence of private schools that do not fall within the scope of the amendment.

### E.    YAFFED's Baseless Criticisms Of Yeshiva Education

YAFFED ties its challenge to the Felder Amendment to a series of unfounded and narrow-minded criticisms of yeshiva education. For instance, YAFFED calls yeshiva education "insufficient," asserts without evidence that yeshiva graduates "suffer from considerably sub-

standard outcomes," and speculates based on "anecdotal evidence" that yeshiva graduates are "often unaware of even basic concepts." *See* YAFFED's Mem. ISO Prelim. Inj. 5-7, n.6.

Notably, nowhere in its Complaint, memorandum of law, or various declarations does YAFFED attempt to quantify those outcomes for the graduates of the public schools most proximate to the yeshivas it criticizes. YAFFED demands substantial equivalence, but how can that be assessed without considering the outcomes for the students on the public school side of the substantial equivalence equation?

Moreover, what YAFFED fails to appreciate is that parents choose yeshiva education – and every child in a yeshiva is there because his or her parent(s) chose to enroll them there – to attain a set of knowledge, abilities, and values that cannot be obtained in a public school.

First, parents choose to send their sons and daughters to yeshivas because they want them to obtain a **Jewish** education – an education in the texts and teachings that they believe are the touchstone of a Jewish life. Second, a yeshiva education provides students with critical thinking and analytical skills that far surpass those obtained by students at traditional schools. *See* Twerski Decl. ¶¶ 14-15. The length of the school day, the depth of the curricular material, and the almost-Socratic method employed in even yeshiva elementary schools provide students with training that is valuable to them as adults across disciplines and professions. *Id.* Finally, a yeshiva education places a heavy emphasis on ethical and moral development, as well as cultural identity, traditions, and cohesion. *Id.* ¶ 16. Those values may not be important to YAFFED, which focuses on measures of material success, but they are what matter to the thousands of parents who choose each year to enroll their children in yeshivas. *Id.*

YAFFED pays lip service to the Chasidic desire to "maintain[] the continuity of their culture" by "sending their children to non-public schools run by and for the ultra-Orthodox

community," YAFFED's Mem. ISO Prelim. Inj. 5, but YAFFED does not appreciate the centrality of yeshivas to the continuity, growth and vitality of Orthodox Jewish life and cultural identity. Twerski Decl. ¶ 4.

**F.     The Common Core And Next Generation Standards**

The Common Core is a set of learning standards designed to ensure that students reach a series of reading, writing, and math benchmarks by the time they graduate. Rather than focus on specific content, the Common Core underscores the teaching of skills-based competencies. New York State is in the process of moving away from the Common Core to its own set of guidelines, the Next Generation Learning Standards. Like the Common Core, Next Generation is standards based and include guidelines for accommodating English Language Learners – students whose home language is not English – by permitting them to receive instruction in their home language. Schick Decl. ¶ 6.

Because the Common Core and Next Generation are standards-based, there is wide latitude in how the standards can be met. There is nothing that precludes satisfaction of either the Common Core or Next Generation standards via the Jewish Studies curricula commonly utilized in yeshivas. Schick Decl. ¶ 7. And, accordingly, when the New York City Department of Education visited yeshivas in 2017 to assess their fulfillment of the substantial equivalence requirement – well before the Felder Amendment was proposed, let alone adopted – they did not limit their inspection to the secular studies classes and curriculum, but also visited Jewish studies classes. *See* Sebbag Decl. ¶ 5; Schwartz Decl. ¶ 5.

**G.     YAFFED's Challenge To The Felder Amendment**

YAFFED alleges that the Felder Amendment violates the Establishment Clause and YAFFED asks the Court to issue a preliminary injunction prohibiting state officials from "enforcing or promulgating guidelines in compliance with" Section 3204(a) as revised by the

Felder Amendment. *See* YAFFED's Mem. ISO Prelim. Inj. 1. In its brief on the motion, YAFFED's argues that the Felder Amendment violates the Establishment Clause because it (1) was enacted "for" ultra-Orthodox Jewish parents; (2) applies a different standard for compliance with the "substantial equivalence" requirement; and (3) requires public officials to consider "the entirety of the curriculum" of sectarian institutions and thus creates "excessive entanglement" with religion. *See id.* at 1, 2, 14, 15, 23, 29-34.

## ARGUMENT

Since YAFFED is seeking to alter the status quo by enjoining a validly enacted state statute, it can only obtain its requested preliminary injunction if it can show (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the party's favor, and (4) that an injunction is in the public interest. *ACLU v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015); *see Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003) ("Where the requested preliminary injunction would stay government action taken in the public interest pursuant to a statutory or regulatory scheme – as it does here – the less rigorous burden of proof standard envisioned by the phrase fair ground for litigation' does not apply, and instead the party seeking injunctive relief must satisfy the more rigorous prong of 'likelihood of success.'").

YAFFED, however, cannot satisfy any of the aspects of that standard, let alone all of them.

## I.   YAFFED WILL NOT SUFFER IRREPARABLE HARM

YAFFED cannot show that it is likely to suffer irreparable harm absent an injunction.

YAFFED argues that it is likely to suffer irreparable harm absent an injunction because the Felder Amendment "frustrates YAFFED's purpose," is forcing it "to divert its resources away from its traditional mission and towards defeating the Felder Amendment," and has "resulted in decreased fundraising opportunities for YAFFED." *See* YAFFED's Mem. ISO Prelim. Inj. 36-37.

Those are not cognizable harms. Indeed, YAFFED has not – and cannot – cite to any decision that finds irreparable harm merely because a plaintiff's lobbying efforts have failed or because the plaintiff has been unable to raise funds to repeal a law.

YAFFED then attempts to fall back on the argument that its irreparable harm should be presumed absent an injunction because it has alleged a First Amendment violation. *See id.* at 34-35. But the Second Circuit has "not consistently presumed irreparable harm in cases involving allegations of the abridgement of First Amendment rights." *Bronx Household of Faith*, 331 F.3d at 349. Instead, the Second Circuit has held that when a plaintiff "alleges an injury from a rule or regulation that *directly limits*" the First Amendment right, "the irreparable harm may be presumed." *Id.* (emphasis added). Here, however, YAFFED cannot show that the Felder Amendment directly (or indirectly) limits any of its First Amendment rights.

In any event, YAFFED's fallback argument presumes its likelihood of success on the merits. But for the reasons set forth in the Defendants Motion to Dismiss as well as those set forth below, YAFFED has no likelihood of success on the merits and therefore will suffer no injury.

Moreover, where, as here, a plaintiff has delayed for several months before seeking a preliminary injunction, the "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 277 (2d Cir. 1985) (citation and quotation marks omitted). Given that sort of delay, "courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.,* 13 F. Supp. 2d 417, 419 (S.D.N.Y.1998). Here, five months passed between the date the Felder Amendment was enacted and YAFFED's request for a preliminary injunction.

## II. NEITHER THE BALANCE OF EQUITIES NOR THE PUBLIC INTEREST FAVOR A PRELIMINARY INJUNCTION

YAFFED also cannot show that the balance of equities or the public interest favor a preliminary injunction. Here, YAFFED tries to have it both ways. On the one hand, YAFFED argues that the pre-Amendment conditions were inadequate. *See* YAFFED's Mem. ISO Prelim. Inj. 16. ("YAFFED has put years' worth of work into pushing for revised guidelines from the state for purposes of enforcing the previous version of the law."). On the other hand, YAFFED urges the Court to return matters to the pre-Amendment status via a preliminary injunction.

In other words, YAFFED urges the Court to impose past guidelines that it argues are wholly inadequate, and to do so by enjoining the State from formulating the new guidelines that the State Education Department is apparently working on. That defies logic, let alone the public interest. And the interests of tens of thousands of yeshiva students and their parents in seeing the implementation of a duly enacted statute clearly outweighs YAFFED's concerns about its fundraising and publicity. *See N.J. v. New York*, 872 F. Supp. 2d 204, 214 (E.D.N.Y. 2011) (holding that benefit to "children of uninterrupted education during their formative middle and high school years" outweighed purely administrative concerns).

## III. YAFFED CAN NOT PREVAIL ON THE MERITS

For the reasons set forth in Defendants' Memorandum of Law in support of their motion to dismiss, the Complaint should be dismissed for lack of standing and because the controversy is not ripe. That alone is sufficient to prevent YAFFED from demonstrating a likelihood of success on the merits. But even if the Court were to look at YAFFED's constitutional arguments, it would find them to be entirely without merit.

## A.   YAFFED Urges The Court To Adopt A Rule That Would Violate The Free Exercise Clause

YAFFED's constitutional arguments have it entirely backwards.  They are not merely wrong when asserting that the Felder Amendment violates the Establishment Clause.  They seek to put the State in violation of the Free Exercise Clause by urging this Court to adopt a rule that would prohibit the State from even considering the secular benefits of a Jewish Studies curriculum that satisfies the Common Core and Next Generation learning standards.

To illustrate how untenable the rule urged by YAFFED is, consider the only three possible scenarios regarding the State's consideration of a yeshiva's Jewish Studies curriculum:

- In the first scenario, state officials find that by reviewing only the secular studies curriculum at the school it satisfies the substantial equivalence requirement.  In this situation, consideration of Jewish Studies has no impact whatsoever.

- In a second scenario, state officials assess the entire curriculum, as required by the Felder Amendment.  But even after that review, they find that the school is *not* in compliance with the substantial equivalence requirement.  In this unlikely situation, the Felder Amendment again has not affected the analysis or outcome.

- In the third scenario, state officials assess the entire curriculum and conclude that the school would be in compliance with the substantial equivalence requirement when taking into consideration the Jewish Studies curriculum's satisfaction of the relevant learning standards, but that the school would not be in compliance if state officials have to disregard the Jewish Studies curriculum.  It is only here that consideration of the Jewish Studies curriculum affects the outcome.

Thus, if YAFFED were to obtain its requested injunction, an Orthodox Jewish mother would be in violation of the State's compulsory education requirement if her son attended a school whose Jewish Studies curriculum helped satisfy the State's secular learning standards – for the sole reason that the school utilized Jewish Studies materials in satisfying the required standards.

The rule urged by YAFFED would be unconstitutional if enacted by a legislature or adopted by a regulator.  It surely should not be imposed by this Court.

1. **A Rule Prohibiting The State From Even Considering The Secular Benefits Of A Jewish Studies Curriculum Violates The Free Exercise Clause**

While *Employment Division v. Smith*, 494 U.S. 872 (1990), held that a neutral law of general applicability that incidentally burdens religion usually does not violate the Free Exercise Clause, there are exceptions. A "law targeting religious beliefs as such is never permissible." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993). And "if the object of a law is to . . . restrict practices because of their religious motivation, the law is not neutral." *Id.* Such government discrimination against religion calls for application of strict scrutiny:

> A law burdening religious practice that is *not neutral* or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests.

*Id.* at 546. Unsurprisingly, a "law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Id. See also Cent. Rabbinical Congress v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197-98 (2014).

If New York were to prohibit educators from even considering the secular benefits of a Jewish Studies curriculum, it would be discriminating against religion by unlawfully targeting Chasidic Jews and Chasidic schools in violation of the Free Exercise Clause. There is no government interest or tailoring sufficient to justify such blatant religious discrimination.

A compulsory education law prohibiting the State from even considering if a Jewish Studies curriculum satisfies the secular learning standards would either (1) effectively prohibit Chasidic parents from sending their children to yeshivas; (2) force those parents to violate the compulsory education law and suffer its sanctions; or (3) radically alter the religious character of

yeshivas in violation of their beliefs. Such compulsion would "gravely endanger if not destroy" their free exercise rights. *Yoder*, 406 U.S. at 219.

This is not hyperbole. Consider, for example, N.Y. Comp. Codes R. & Regs. tit. 8, § 100(c), which arguably requires students in grades 7 and 8 to complete 11.5 "units of study." A "unit of study" is defined as at least 180 minutes of instruction per week throughout the school year, or the equivalent." N.Y. Comp. Codes R. & Regs. tit. 8, § 100.1(a). If the State Education Department were to make N.Y. Comp. Codes R. & Regs. tit. 8, § 100(c) the basis for compliance with the substantial equivalence requirement, and the rule sought by YAFFED prohibiting the consideration of the Jewish Studies curriculum in satisfaction of that requirement were adopted, that would mean that a yeshiva would have to devote 34.5 hours a week – or essentially 7 hours a day, five days a week – to secular studies in grades 7 and 8.

That would force Orthodox Jewish parents to choose between providing their children with a Jewish education or complying with New York's compulsory education law, and would require yeshivas to diminish their emphasis of Jewish Studies. *Lukumi* and *Yoder* do not allow that result. *See Leebaert v. Harrington*, 332 F.3d 134, 144 (2d Cir. 2003) ("This threat to the Amish community's way of life, posed by a compulsory school attendance statute, was central to the holding in *Yoder*.").[1]

---

[1] The rule that YAFFED seeks would also violate the Equal Protection Clause. In *Fraternal Order of Police Newark Lodge No. 12 v. Newark*, the Third Circuit noted that the government may not create "a categorical exemption for individuals with a secular object but not for individuals with a religious objection." 170 F.3d 359, 365 (1999). But that is exactly what YAFFED urges here. Here, not only does the State Education Department provide flexible interpretations of its standards for various secular groups that employ non-traditional modes of education, *See, supra,* at 6-7, but the State would be disqualifying Jewish Studies that satisfy its secular learning standards even though it has adopted learning standards without dictating any specific content that needs to be utilized to convey and satisfy them.

2.   **A Rule Prohibiting The State From Even Considering The Secular Benefits Of A Jewish Studies Curriculum Would Exceed The State's Limited Power To Regulate Religious Schools**

The State's power to regulate private (and religious) schools is plainly limited.  Indeed, even in public schools, "the discretion of the States and local school boards must be exercised in a manner that comports with the transcendental imperatives of the First Amendment." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 864 (1982).  Here, two of those limits on the State's power to regulate religious schools are at issue.

*First*, while a state may regulate private and religious schools, it may not regulate the intimate and essential details of the schools and must leave them wide discretion in the management of their affairs.  In *Farrington v. Tokushige*, 273 U.S. 284, 293-95 (1927), the Supreme Court considered a Hawaii statute that regulated the operations of the foreign language schools in the state.  In striking down the statute, the Court held that it went "far beyond mere regulation of privately supported schools" because it gave "affirmative direction concerning the intimate and essential details of such schools," entrusted "their control to public officers," and denied "both owners and patrons reasonable choice and discretion in respect of teachers, curriculum and text-books." *Id.* at 297.  Accordingly, given the attempt to regulate the intimate and essential details of the school, the Court held that enforcement of the statute "would deprive parents of fair opportunity to procure for their children instruction which they think important and we cannot say is harmful." *Id.* at 408-09.[2]  Similarly, in *State v. Whisner*, 47 Ohio St. 2d 181, 211-12 (1976), the Ohio Supreme Court struck down state regulations that "would effectively eradicate the distinction between public and non-public education, and thereby deprive these appellants of

---

[2] *See Packer Collegiate Inst. v. Univ. of State of New York*, 298 N.Y. 184, 191-92 (1948) (holding that the State Education Department has only limited powers to regulate private schools, and that SED has no authority to regulate unless it has been expressly delegated the authority by statute).

their traditional interest as parents to direct the upbringing and education of their children." That would be the result here if the State were to impose a rule that prohibited consideration of the many ways that a Jewish Studies curricula may satisfy various aspects of the Common Core and Next Generation standards. *See* Schick Decl. ¶¶ 6-11.

*Second*, while a state may require private and religious schools to teach certain subjects, it may not dictate the content of the instruction provided within that instruction. Consider the selection of textbooks, for instance. As the Seventh Circuit recently noted, "a school's selection of textbooks automatically raises First Amendment concerns because textbook-selection implicates the school's ability to convey a particular message, as well as its ability to convey the message effectively. Thus, a restriction on the school's choice of textbooks . . . interferes with the private school's right to determine for itself 'what may be taught' and 'how it shall be taught.'" *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 19 (1st Cir. 2007). Similarly, the rule urged by YAFFED would impermissibly dictate the specific <u>content</u> that a yeshiva was permitted to use to attempt to satisfy the <u>standards</u> set forth in the Common Core and Next Generation standards.

### B. The Felder Amendment Does Not Violate The Establishment Clauses

As noted above, the Free Exercise Clause requires the State to consider whether a Jewish Studies curriculum satisfies the secular learning standards of the substantial equivalence requirement. But even if it did not, it would still be permissible for the State to do so.

As the Supreme Court has explained, "there is 'play in the joints' between what the Establishment Clause permits and the Free Exercise Clause compels." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (citation and quotation marks omitted). "In other words, there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause." *Locke v. Davey*, 540 U.S. 712, 719 (2004). State actions

falling within this realm are permissible "accommodations" of religion.  The Felder Amendment easily qualifies as one such accommodation.

### 1. There Is No Constitutional Prohibition On Providing An Accommodation Exclusively To Religious Groups

The characteristics of permissible accommodations can be found by reviewing *Cutter v. Wilkinson*, 544 U.S. 709 (2005), which upheld the Religious Land Use and Institutionalized Persons Act (RLUIPA), a federal statute protecting the exercise of religion by state prisoners. In *Cutter*, the Sixth Circuit adopted what might be called the "parallel accommodation theory," under which religious accommodations are unconstitutional if there are no parallel accommodations for comparable secular interests.  Applying this theory, the Sixth Circuit ruled that RLUIPA violated the Establishment Clause because it 'impermissibly advance[ed] religion by giving greater protection to religious rights than to other constitutionally protected rights.'"  *Id.* at 717 (quoting *Cutter v. Wilkinson*, 349 F.3d 257, 264 (2003)).

The Supreme Court disagreed.  In a unanimous decision, the Court rejected any requirement for parallel accommodations, explaining that "[r]eligious accommodations . . . need not come packaged with benefits to secular entities." *Id.*  Thus, contrary to the arguments advanced by YAFFED, the Establishment Clause does not always mandate that a religious accommodation also benefit secular interests.  *See Zorach v. Clauson,* 343 U.S. 306, 313-14 (1952) ("When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions.  For it then respects the religious nature of our people and accommodates the public service to their spiritual needs.  To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups.").

### 2. Removing A Government-Imposed Burden On Religious Practice Is A Classic And Accepted Accommodation

The distinction between a permissible "accommodation" of religion and an impermissible "advancement" of religion lies largely in whether government acting to remove a burden of government's own making. "[R]emoval of government-imposed burdens on religious exercise is more likely to be perceived 'as an accommodation of the exercise of religion rather than as a Government endorsement of religion.'" *Cutter*, 544 U.S. at 720 (quoting *Corp. of Presiding Bishop of the Church of Latter-Day Saints v. Amos*, 483 U.S. 327, 349 (1987) (O'Connor, J., concurring in judgment)).

### C. The Felder Amendment Does Not Violate The Lemon Test

YAFFED claims that it is likely to succeed on the merits because, in its view, the Felder Amendment fails the three-prong test articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). YAFFED is mistaken. As a threshold matter, in reviewing statutes that merely *accommodate* religion, the most relevant Supreme Court precedent is *Cutter*, not *Lemon*.

In *Cutter*, after noting that the Sixth Circuit used *Lemon* to invalidate RPLUIPA, the Court unanimously "resolve[d] the case on other grounds." 544 U.S. at 717 n.6. Disregarding *Lemon*, the Court upheld RLUIPA as a permissible accommodation of religion. Following *Cutter*, this Court should likewise disregard *Lemon* and uphold the Felder Amendment as a permissible accommodation of religion.[3]

But even if *Lemon* provided the appropriate standard here, the Felder Amendment would survive because the legislation satisfies each of the prongs comprising that test.

---

[3] YAFFED cites the Second Circuit's use of *Lemon* in *Cooper v. U.S. Postal Serv.*, 577 F.3d 479 (2d Cir. 2009). But, that case is not analogous. *Cooper* involved religious displays in a postal unit operated pursuant to a contract between the Postal Service and a church. The case did not involve the government's lifting of government-imposed burdens on free exercise. In short, accommodation was not an issue in *Cooper*, and the case does not suggest that *Lemon* should be used when accommodation is the issue.

### 1. The Felder Amendment Has A Secular Purpose

As explained above, the Common Core and Next Generation Learning Standards are not content based. Rather, they seek to ensure that students obtain various skills. Permitting the State to consider whether those skills were obtained via the Jewish Studies curriculum of a yeshiva satisfies the wholly secular purpose of ensuring that students attain the required skills.

In addition to the secular educational purpose, there is also "a secular legislative purpose," *Lemon*, 403 U.S. at 612, in allowing parents to exercise their parental and religious rights to direct their childrens' education and upbringing without violating New York's compulsory education law. *See Brown v. Gilmore*, 258 F.3d 265, 276 (4th Cir. 2001) ("[T]he accommodation of religion is itself a secular purpose in that it fosters the liberties secured by the Constitution."); *Wallace v. Jaffree*, 472 U.S. 38, 83 (1985) (O'Connor, J., concurring) ("It is disingenuous to look for a purely secular purpose when the manifest objective of a statute is to facilitate the free exercise of religion by lifting a government-imposed burden. Instead, the Court should simply acknowledge that the religious purpose of such a statute is legitimated by the Free Exercise Clause.")

### 2. The Primary Effect Of The Felder Amendment Is Not to "Advance" Religion

YAFFED contends that the "primary effect" of the Felder Amendment is to "advance the ultra-Orthodox Jewish religion" by "effectively endors[ing] the curricula in ultra-Orthodox yeshivas." *See* YAFFED's Mem. ISO Prelim. Inj. 31. Again, YAFFED is wrong.

To begin, the Felder Amendment is cast in decidedly secular terms, not religious ones. To the extent that the Felder Amendment "advances" the interest of Chasidic Jews by permitting them to enroll their children in yeshivas without violating New York's compulsory education law, that is not "advancement" in the problematic sense contemplated by *Lemon*. Rather, as previously

explained, it would be a permissible *accommodation* of religion because it ameliorates a government-imposed burden on the free exercise of religion.

YAFFED also contends that the Felder Amendment "endorses" Chasidic Judaism. It contends that, under the substantial equivalence requirement, there will have to be "State consideration of Judaic studies" and that "[t]his conveys a message of approval of Judaic religious studies as taught in the yeshivas." *Id.* at 33. This is a *non-sequitur*. State consideration of Jewish Studies can – and should – be conducted in a doctrinally-neutral way, without the State either approving or criticizing the religious content of those studies.

In *Zobrest v. Catalina Foothills Sch. Dist.*, the Supreme Court determined that it was constitutional for a state-employed sign-language interpreter to accompany a deaf student to his Roman Catholic high school. 509 U.S. 1 (1993). The Court imposed no restriction on the classes that the interpreter could attend or the material that the interpreter could translate. Classes on Catholic doctrine were treated no differently than classes on geometry. In reaching this result, the Court rejected the lower court's view that placing the state-paid interpreter in the Catholic school would create an impermissible "symbolic union of government and religion." *Id.* at 5. The Court then went on to explain:

> Nothing in this record suggests that a sign-language interpreter would do more than accurately interpret whatever material is presented to the class as a whole. . . . James' parents have chosen of their own free will to place him in a pervasively sectarian environment. The sign-language interpreter they have requested will neither add to nor subtract from that environment, and hence the provision of such assistance is not barred by the Establishment Clause.

*Id.* at 13. Just as state-employed personnel may act as doctrinally-neutral translators of material infused with religious content, so too may state-employed personnel act as doctrinally-neutral evaluators to assess whether a Jewish Studies curriculum satisfies the secular Common Core and Next Generation learning standards.

### 3. There Is No Excessive Entanglement With Religion

As the Supreme Court has explained, "[i]nteraction between church and state is inevitable, . . . and we have always tolerated some level of involvement between the two. Entanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Agostini v. Felton*, 521 U.S. 203, 233 (1997). Thus, the fact that state education officials may come into yeshivas to evaluate their educational programs does mean that there will be "excessive entanglement" within the meaning of *Lemon*. Indeed, in its Complaint, YAFFED trumpets its own efforts to have public education officials investigate and assess the education these schools provide. *See* Compl. ¶¶ 52-60.

Even so, YAFFED claims that, under the Felder Amendment, there will be a risk of excessive entanglement because state education officials will be required to consider "the entirety of the curriculum." According to YAFFED, this "type of oversight risks the State telling religious leaders how to teach non-secular material." *See* YAFFED's Mem. ISO Prelim. Inj. 34.

As an initial matter, there is no logical reason why school officials examining a religious school's entire curriculum to determine whether it achieves secular ends by satisfying the secular Common Core learning standards necessitates any entanglement with religion. To draw an analogy, even in a public-school setting, teachers must sometimes evaluate and grade work in which the student has chosen a religious theme. A child tasked with a holiday art project might choose to illustrate Jesus in the manger. A student assigned to write an essay about the life of a famous leader might choose King David, or Mohammed. Another student, called upon to memorize and deliver a famous speech, might forego Lincoln's Gettysburg address in favor of one of Moses' speeches to the people of Israel found in Deuteronomy, or Paul's speech to the Athenians.

In cases such as these, so long as the student's work is germane to the assignment, the teacher cannot reject the work because of its religious theme, nor can the teacher endorse or criticize the religious values reflected in the work. Instead, the teacher must evaluate and grade the work based on its secular attributes: What are the artistic qualities of the illustration? Does the essay present the student's thoughts in an organized fashion, with complete sentences, correct grammar and good vocabulary? Did the speaker memorize the material well and deliver the speech convincingly and with good articulation?

Likewise, state education officials can evaluate whether a yeshiva's Jewish Studies curriculum satisfies the secular Common Core or Next Generation learning standards based solely on its *secular* attributes, without endorsing or criticizing the religious values reflected in that curriculum. *See Jones v. Wolf*, 443 U.S. 595, 604 (1979) (holding that state actors can apply neutral principles of law without violating the First Amendment when examining religious documents in a dispute between religious groups); *Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 209 (2d Cir. 2012) ("Such routine regulatory interactions between the State and sellers of kosher products, which involve no inquiries into religious doctrine, no delegation of state power to a religious body, and no detailed monitoring or close administrative contact between secular and religious bodies, do not violate the non-entanglement command of the First Amendment.").

As set forth in the Schick Declaration, there are numerous skills that can be assessed without reference to any religious doctrine, including reading with sufficient accuracy and fluency to support comprehension; understand main messages; chronological reasoning and causation; integration of knowledge and ideas, and many others. Schick Decl. ¶¶ 9-11.

Moreover, in *Agostini*, the Supreme Court allowed publicly-paid teachers to be placed in religious schools for limited purposes. The Court rejected an "excessive entanglement" challenge, explaining that "we have abandoned the assumption that properly instructed public employees will fail to discharge their duties faithfully." 521 U.S at 234. If publicly paid educators can provide service to religious school students in their religious school without violating *Lemon*, it is surely permissible to assume that state employees who are not working in those schools or teaching the students there but merely assessing the curriculum for compliance with state standards can be trusted to discharge their duties properly without violating the Constitution.

Unable to find any authority to support its claim, YAFFED turns to *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982), a case having no relevance to the Felder Amendment. *See* YAFFED's Mem. ISO Prelim. Inj. 33. In *Larkin*, the Court struck down a Massachusetts statute that "conferr[ed] upon churches a veto power over governmental [liquor] licensing authority," where the licensed establishment would be located within 500 feet of the church. *Larkin*, 459 U.S. at 125. The statute gave churches "the right to determine whether a particular applicant will be granted a liquor license, or even which one of several competing applicants will receive a license." *Id.* Under these circumstances, the Court found a violation of *Lemon*'s "excessive entanglement" prong, saying that "[t]he Framers did not set up a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions." *Id.* at 127. But nothing like that is going on here. The Felder Amendment does not delegate any governmental powers to any private entity. On the contrary, the Amendment explicitly empowers the Commissioner of the State Education Department to determine whether a school has fulfilled its substantial equivalence requirement.

YAFFED's claims of excessive entanglement, like all of its other constitutional arguments, are entirely without merit.

## CONCLUSION

YAFFED's assault upon the Felder Amendment is without merit. Its motion for a preliminary injunction should be denied.

Dated: October 5, 2018

Respectfully submitted,

By: __/s/ Avi Schick_____
Avi Schick
William H. Hurd
Timothy A. Butler
TROUTMAN SANDERS LLP
875 Third Avenue
New York, New York 10022
T: (212) 704-6136
F: (212) 704-6288
Email: avi.schick@troutman.com

*Counsel for Amicus Curiae Parents for Educational and Religious Liberty in Schools, Agudath Isreal of America, Torah Umesorah: National Society for Hebrew Day Schools and United Jewish Organizations of Williamsburg*