UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
YOUNG ADVOCATES FOR FAIR EDUCATION,

     Plaintiff,

  - against -


ANDREW CUOMO, in his official capacity
as Governor of the State of New York,
BETTY ROSA, in her official capacity as
Chancellor of the Board of Regents of the
State of New York,
MARYELLEN ELIA, in her official capacity
as Commissioner of the New York State
Education Department,

   •   Defendants.
----------------------------------------------------------x

MEMORANDUM AND ORDER
18-CV-4167

GLASSER, Senior United States District Judge:

  New York's Education Law provides that children in private schools must receive an education that is "at least substantially equivalent" to the instruction given at public schools in the city or district where they reside. N.Y. Educ. L. § 3204(2)(i). On April 12, 2018, Governor Andrew Cuomo signed into law an amendment to the Education Law setting forth factors that must be considered when evaluating whether certain private schools provide a "substantially equivalent" education. *See* L. 2018, ch. 59, pt. SSS (the **"Felder Amendment"** or the **"Amendment"**); N.Y. Educ. L. § 3204(2)(ii)-(v). Although the Felder Amendment does not refer to religious schools on its face, Young Advocates for Fair Education (**"YAFFED"**), a non-profit group that advocates for improved secular education in the Hasidic Jewish community, argues that the Amendment was designed to reduce the level of secular education that must be taught in private Hasidic Jewish schools without changing the educational requirements

applicable to other private schools, including other religious schools. (ECF No. 1 ("Compl.")) ¶¶ 8-9, 12).

YAFFED brought this action on July 23, 2018, alleging that the Felder Amendment violates the Establishment Clause of the First Amendment to the United States Constitution and seeking declaratory and injunctive relief. YAFFED names Governor Cuomo, Betty Rosa, Chancellor of the Board of Regents of the State of New York, and MaryEllen Elia, Commissioner (the "**Commissioner**") of the New York State Education Department ("**NYSED**"), in each case in their official capacities, as Defendants. On August 24, 2018, YAFFED moved for a preliminary injunction "restraining and enjoining Defendants ... from enforcing or promulgating guidelines in compliance with the [Felder Amendment] [and] ordering Defendants to maintain the statutory *status quo ante* as it existed prior to April 12, 2018." (ECF No. 17, at 1-2). On October 2, 2018, Defendants moved to dismiss pursuant to Federal Rules of Civil 12(b)(1) and (6) on standing, ripeness and Eleventh Amendment grounds. (ECF Nos. 32, 34).

The statute at issue in this case, and the events leading up to its enactment, have aroused strong feelings on both sides and raise substantial questions of constitutional law. However, Article III of the United States Constitution limits this Court's jurisdiction to "Cases" and "Controversies," which the Supreme Court has construed to require that "the plaintiff ... have suffered an 'injury in fact'—an invasion of a legally protected interest" which is "concrete and particularized," as well as "actual or imminent, not 'conjectural' or 'hypothetical.' " *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). This standing requirement "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic

appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982). The Court has no desire to evade the complex questions presented here, mindful that the judiciary's application of the standing doctrine has occasionally been criticized as a way of punting on difficult questions or avoiding a ruling on the merits. *See, e.g.,* Mark V. Tushnet, *The Sociology of Article III: A Response to Professor Brillmayer*, 93 Harv. L. Rev. 1698, 1715 n. 72 (1980); Mark V. Tushnet, *The New Law of Standing: A Plea for Abandonment*, 62 Cornell L. Rev. 663, 663-664 (1977). However, on the present record, YAFFED has failed to demonstrate that it has suffered an injury in fact sufficient to confer standing, or that such an injury is "certainly impending." *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 389 (2d Cir. 2015) (quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013)). Therefore, the Court has no choice but to grant Defendant's motion to dismiss pursuant to Rule 12(b)(1).

## BACKGROUND

### I.     The Education Law Prior to April 12, 2018

The Education Law requires children aged 6 to 16 in New York State to attend "full time instruction" and sets forth minimum standards for the quality of instruction in public schools. N.Y. Educ. L. §§ 3204, 3205(1), (3). Public schools must teach particular subjects at various grade levels, including English language, reading, writing, mathematics, geography, United States history, science, music, visual arts, and physical education. *See* N.Y. Educ. L. § 3204(3)(a); 8 N.Y.C.R.R. §§ 100.2-100.5, 135.4. The State also requires instruction in specialized topics including mental health, alcohol and drug abuse, patriotism, citizenship, and human rights, among others. *See* N.Y. Educ. L. §§ 801, 801-a, 803, 804, 806, 808, 809, 810; 8 N.Y.C.R.R. §§ 100.2(c), 135.3.

In private schools, including parochial schools, students must receive instruction that is "at least substantially equivalent" to the instruction given at public schools in the city or district where they reside. *Id.* § 3204(2)(i). It is generally up to the local school board, through the district superintendent, to determine whether its students are receiving a "substantially equivalent" education. *See Blackwelder v. Safnauer*, 689 F.Supp. 106, 122 (N.D.N.Y. 1988); *Matter of Adam D.*, 132 Misc.2d 797, 801, 803 (N.Y. Fam. Ct., Schoharie County 1986); *Appeal of M. L. B.*, 34 Ed. Dept. Rep., Decision No. 13225, 1994 WL 16854677, at *2 (N.Y. Comm'n Educ. Jul. 22, 1994); *Appeal of N. and A.A.*, 33 Ed. Dept. Rep., Decision No. 13118, 1994 WL 16854598, at *2 (N.Y. Comm'n Educ. Feb. 28, 1994).[1] In New York City, this function is discharged by the Chancellor of the New York City Department of Education ("NYCDOE"). *See* New York State Department of Education, "Substantial Equivalency Review and Determination Process" 1-2 (Nov. 20, 2018), *available at* http://www.nysed.gov/common/nysed/files/programs/nonpublic-schools/substantial-equivalency-guidance.pdf.[2] Parents and/or private school officials may appeal the local school authority's adverse determination directly to the Commissioner of Education. *See Blackwelder*, 689 F.Supp. at 122; *Adam D.*, 132 Misc.3d at 803.[3]

---

[1] Alternatively, private schools may voluntarily register with NYSED, in which case they are deemed to satisfy the substantial equivalence requirement. *See Appeal of Fusion Academy-Brooklyn*, 56 Ed. Dept. Rep., Decision No. 17070 (N.Y. Comm'n Educ. Apr. 5, 2017).

[2] This opinion employs the term **"local school authority"** to refer to the local school board or the NYCDOE, as applicable.

[3] The Commissioner of Education serves as the "chief administrative officer" of NYSED. N.Y. Const., Art. V, § 4; N.Y. Educ. L. § 101. NYSED is "charged with the general management and supervision of all public schools and all of the educational work" of the State of New York. N.Y. Educ. L. § 101. The Commissioner is required to "enforce all general and special laws relating to the educational system of the state and execute all educational policies determined upon by the

The Education Law does not define what it means for private school instruction to be "substantially equivalent." However, for years, NYSED maintained "guidelines" which essentially incorporated most of the statutory and regulatory requirements applicable to public schools, *see* N.Y. Educ. L., Title I, Art. 17; *id.* § 3204(3)(a); 8 N.Y.C.R.R. §§ 100.2-100.5, and applied them to private schools. (ECF No. 39 ("Coughlin Decl.") ¶ 3). *See* New York State Department of Education, "Guidelines for Determining Equivalency of Instruction in Nonpublic Schools" (the **"Prior Guidelines"**), Question 24, *available at* http://www.p12.nysed.gov/nonpub/guidelinesequivofinstruction.html. Hence, under the Prior Guidelines, all private schools in the State were legally required to teach English, mathematics, science, social studies, art, music, physical education, and health, among other courses.

## II.     Hasidic Education in New York

Hasidic[4] Jewish parents generally choose to educate their children in a network of religious schools. (ECF No. 27 ("Moster Decl.") ¶ 31). During the 2013-2014 school year, according to one estimate, there were approximately 52,063 students enrolled in Hasidic schools throughout New York City, representing nearly half of all enrollment in Jewish day schools. *See* Marvin Schick, *A Census of Jewish Day Schools in the United States 2013-2014*, at 33, Table 13 (October 2014).[5] These schools are segregated by gender, with boys attending what are called

---

board of regents." *Id.* § 305(1). In addition, she exercises "general supervision over all schools and institutions which are subject to" the provisions of the Education Law. *Id.* § 305(2).

[4] *Hasid* is the Hebrew word for "pious." Hasidic Jews, or Hasidim, are the largest sub-group of Haredi Jews. Haredim are sometimes referred to as "ultra-Orthodox," although this term may be considered objectionable.

[5] The remaining Jewish day schools are affiliated with other Orthodox movements (including both haredi and modern Orthodox schools) or are non-Orthodox schools (*i.e.*, Reform, Conservative or Community). *See* Schick, *supra*, at 32-33.

*yeshivas* (or, at younger ages, *cheder*). (Moster Decl. ¶ 31). As stated by *amici* who are supportive of the Felder Amendment:

> Orthodox Jewish parents choose yeshiva education for their children to fulfill the Biblical injunction that "You shall place these words of Mine upon your heart and upon your soul ... and you shall teach them to your children to speak in them." Deuteronomy 11:18-19. The Bible says of Abraham, "I have known him because he commands his sons and his household after him, that they should keep the way of the Lord." Genesis 18:19.

(ECF No. 41, at 1 (Brief of Amici Curiae Parents for Educational and Religious Liberty in Schools (PEARLS), Agudath Israel of America, Torah Umesorah: National Society for Hebrew Day Schools, and United Jewish Organizations of Williamsburg (UJO) (collectively, the **"PEARLS Amici"**)). For parents who choose a traditional yeshiva education for their children, it is an important pillar of continuity within the Hasidic community, assuring that their beliefs will be reliably passed on from one generation to the next, and instilling an invaluable sense of Jewish identity and belonging. (ECF No. 44 ("Twerski Decl.") ¶¶ 5-12). Proponents argue that these schools are "the primary vehicle responsible for inculcating Jewish values, Jewish learning and Jewish living, are responsible for the rebirth of the Jewish community out of the ashes of destruction in Eastern Europe, and are what today ensures and allows for the continuity and growth of the Jewish community in New York and around the country." (Twerski Decl. ¶ 12).

    This lawsuit comes in the midst of an ongoing dispute over the quality and efficacy of the secular education being provided at Hasidic yeshivas. The limited data available[6] suggests that,

---

[6] It does not appear that a large-scale study has ever been conducted into the education provided at Hasidic schools in New York.

One comprehensive source of information on this subject was an investigation carried out by NYCDOE in response to a complaint by YAFFED and co-signed by fifty-two yeshiva graduates, parents of current students, and current teachers, regarding 39 yeshivas in Brooklyn and Queens. (Bridges Ex. 18 ("**NYCDOE Investigation**")). NYCDOE interviewed the complainants in 2015

between ages 7 and 12, boys receive no more than approximately 90 minutes of secular study per day, four days per week. (*Non-Equivalent* 31; NYCDOE Investigation 4). These classes are usually limited to English and mathematics and may be taught in either English or Yiddish. (*Non-Equivalent*, 31-33; NYCDOE Investigation 4-5). The remainder of the school day consists of a religious curriculum conducted in Yiddish. (*Non-Equivalent* 4, 52). After age 13, secular studies cease altogether. (*Non-Equivalent* 31, 34-36; NYCDOE Investigation 4). Girls' schools, by contrast, provide somewhat more secular education in earlier grades, and this secular education extends beyond age 13. (*Non-Equivalent* 31, 33, 36).

## III.     The Felder Amendment

The Felder Amendment was introduced by State Senator Simcha Felder and passed both chambers of the State Legislature on March 30, 2018. It was signed into law by Governor Cuomo on April 12, 2018, whereupon it took immediate effect. The Amendment applies only to schools that are organized as a not-for-profit corporation, have a bilingual program, and operate during certain specified hours. *See* N.Y. Educ. L. § 3204(2)(ii), (iii).[7] YAFFED contends that

---

and 2016, and its findings were summarized in an August 2018 letter by NYCDOE Chancellor Richard A. Carranza to Commissioner Elia.

Another source of information is a September 2017 report published by YAFFED, entitled *Non-Equivalent: The State of Education in New York City's Hasidic Yeshivas*. (Moster Decl. Ex. 1 ("*Non-Equivalent*")). Although its findings are consistent with the NYCDOE investigation, the YAFFED report is not without methodological limitations. The report is primarily based on an online survey, conducted by YAFFED, of former yeshiva graduates and parents of current yeshiva students, of whom 49 attended Hasidic elementary school and 44 attended a high-school level Hasidic yeshiva. (*Non-Equivalent* 75). Professor Awi Federgruen, a Columbia Business School professor whose declaration was submitted by the PEARLS Amici, has criticized the methodology of the survey and questioned its reliability for its small sample size, the fact that it was distributed through social media, and the fact that the survey questions were not clearly disclosed in the report. (ECF No. 56 ¶¶ 6-17).

[7] Specifically, the Felder Amendment applies to:

virtually all schools in New York that fit these narrowly-tailored criteria are Haredi Jewish yeshivas. (Compl. ¶¶ 76, 80; Moster Decl. ¶ 39). Although there is little official legislative history accompanying the Amendment, statements by Senator Felder appear to confirm that the Amendment was drafted with these yeshivas in mind. (Bridges Ex. 11, at 7; Bridges Ex. 30, at 4). Because it is not certain to which schools the Amendment will apply in practice, the Court will simply refer to private schools covered by the Felder Amendment as "**covered schools**."

Substantively, the Amendment has three basic parts. First, it provides that the Commissioner of Education, rather than local school authorities, shall determine whether a covered school's education is "substantially equivalent" to that of a public school within the city or district where its students reside. *See* N.Y. Educ. L. § 3204(2)(v). Responsibility for making such determinations with respect to non-covered schools remains in the hands of local school authorities.

---

... non-public elementary and middle schools that are: (1) non-profit corporations, (2) have a bilingual program, and (3) have an educational program that extends from no later than nine a.m. until no earlier than four p.m. for grades one through three, and no earlier than five thirty p.m. for grades four through eight, on the majority of weekdays . . . .

N.Y. Educ. L. § 3204(2)(ii), and to:

... non-public high schools that: (1) are established for pupils in high school who have graduated from an elementary school that provides instruction as described in this section [*sic*], (2) are a non-profit corporation, (3) have a bilingual program, and (4) have an educational program that extends from no later than nine a.m. until no earlier than six p.m. on the majority of weekdays . . . .

*Id.* § 3204(2)(iii).

Second, the Amendment provides that, in assessing whether covered schools provide a "substantially equivalent" education, NYSED "shall consider ... if the curriculum provides academically rigorous instruction that develops critical thinking skills in the school's students," "taking into account the entirety of the curriculum." *Id.* § 3204(2)(ii), (iii). The statute clarifies, however, that NYSED's review is "not limited to" these considerations. *Id.* § 3204(2)(ii), (iii).

Third, with respect to elementary and middle schools covered by the Amendment, NYSED's review must "includ[e]" an assessment of whether the school is adequately teaching four core classes: English; mathematics; history (which need not include United States history); and science (which the statute defines broadly as "learning how to gather, analyze and interpret observable data, using deductive and inductive reasoning to support a hypothesis, and [learning] how to differentiate between correlational and causal relationships"). *Id.* § 3204(2)(ii). These criteria are more relaxed than those made applicable under NYSED guidelines in effect at the time of the Amendment's enactment. *Cf.* Prior Guidelines, *supra,* Question 24. For covered high schools, the Amendment requires no instruction in any particular subjects, but only that the "outcomes" of the instruction provided at covered high schools, "taking into account the entirety of the curriculum, result in a sound basic education." N.Y. Educ. L. § 3204(2)(iii).[8]

---

[8] The relevant text of the Felder Amendment is as follows. For covered elementary and middle schools:

> For purposes of considering substantial equivalence ... the department shall consider the following, but not limited to: if the curriculum provides academically rigorous instruction that develops critical thinking skills in the school's students, taking into account the entirety of the curriculum, over the course of elementary and middle school, including instruction in English that will prepare pupils to read fiction and nonfiction text for information and to use that information to construct written essays that state a point of view or support an argument; instruction in mathematics that will prepare pupils to solve real world problems using both number sense and fluency with mathematical functions and operations; instruction in history by being

Viewed holistically, the effect of the Felder Amendment was to expand NYSED's discretion to exempt covered schools from the educational requirements otherwise applicable to private schools under NYSED's then-existing guidelines. As indicated by the Amendment's use of open-ended language such as "including" and "not limited to," the specific educational criteria set forth in the Amendment establish a floor rather than a ceiling. NYSED could deem schools to be compliant with the Education Law's substantial equivalence mandate if they meet these minimal requirements. Alternatively, NYSED could impose learning standards that go above and beyond these statutory requirements, and deem any schools that fall beneath these heightened standards noncompliant with the substantial equivalence mandate—even if the schools provide the basic level of instruction required in the Felder Amendment itself. Either is a permissible interpretation of the statute.[9] In short, the Amendment permits NYSED to treat covered schools more leniently than non-covered schools, but it does not require that it do so.

---

> able to interpret and analyze primary text to identify and explore important events in history, to construct written arguments using the supporting information they get from primary source material, demonstrate an understating [sic] of the role of geography and economics in the actions of world civilizations, and an understanding of civics and the responsibilities of citizens in world communities; and instruction in science by learning how to gather, analyze and interpret observable data to make informed decisions and solve problems mathematically, using deductive and inductive reasoning to support a hypothesis, and how [sic] to differentiate between correlational and causal relationships. N.Y. Educ. L. § 3204(2)(ii).

For covered high schools:

> For purposes of considering substantial equivalence ... the department shall consider the following but not limited to: if the curriculum provides academically rigorous instruction that develops critical thinking skills in the school's students, the outcomes of which, taking into account the entirety of the curriculum, result in a sound basic education. *Id.* § 3204(2)(iii).

[9] To illustrate, even though the Prior Guidelines required private schools to teach United States history, the Felder Amendment does not include United States history as part of the required

## IV. The Revised Guidelines

On November 20, 2018, nearly four months after YAFFED filed this lawsuit, NYSED released revised guidelines that describe the factors that educational officials will consider when reviewing private schools for substantial equivalence (the "Revised Guidelines").[10] The Revised Guidelines were drafted over the course of a nearly two-year consultative process that commenced long before the Felder Amendment was conceived. (Coughlin Decl. ¶ 4). These guidelines apply to all private schools, not just covered schools, although they take the statutory mandates contained in the Felder Amendment into consideration. Like the Prior Guidelines, which they superseded, the Revised Guidelines do not have the binding force of law. Nevertheless, because the Commissioner has ultimate review power over all substantial equivalency determinations in the State, the Revised Guidelines are a reliable indicator of how the substantial equivalence requirement, including the Felder Amendment, will be enforced in practice.

---

history curriculum at covered schools. *Compare* N.Y. Educ. L. § 3204(2)(ii) *with* Prior Guidelines, *supra*, Question 24. Therefore, the Felder Amendment permits the Commissioner to exempt covered schools from the United States history requirement. However, the Commissioner, in her discretion, may continue to require that both covered and non-covered private schools teach United States history.

[10] The Revised Guidelines do not appear in a single document, but instead comprise multiple documents available on NYSED's website at http://www.nysed.gov/nonpublic-schools/substantial-equivalency. NYSED has made clarifications to the guidelines between November 20, 2018 and the date of this opinion. The guidelines that appear on NYSED's website reflect the most current version. The Court may *sua sponte* take judicial notice of the contents of these guidelines. *See Cruz v. Credit Control Services, Inc.*, 2017 WL 5195225, at *3 (E.D.N.Y. Nov. 8, 2017) ("It is entirely proper for the Court to take judicial notice of publicly available documents on government websites"); *Fernandez v. Zoni Language Centers, Inc.*, 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016) ("Courts regularly take notice of publicly available documents … retrieved from official government websites").

With minor exceptions, the Revised Guidelines incorporate the curricular standards contained in the Education Law and its implementing regulations, *see* N.Y. Educ. L., Title I, Art. 17; *id.* § 3204(3)(a); 8 N.Y.C.R.R. §§ 100.2-100.5, 135.3-135.4, and apply them to all private schools. In this sense, the Revised Guidelines are largely a continuation of the Prior Guidelines, albeit with some changes and clarifications. The Revised Guidelines come with "Toolkits," which are simply checklists of factors that will be reviewed by education officials when making their determination, and each factor corresponds to a specific provision of the Education Law or the regulations promulgated thereunder. The Toolkits are accompanied by an appendix, which sets forth a detailed list of course requirements for private schools at various grade levels and, for some grades, the number of hours per week that must be devoted to each subject. Core subjects such as mathematics, science, English, social studies, art and health must be taught throughout elementary, middle and high schools. In grades 7 and 8, the Revised Guidelines require approximately 3 ½ hours of secular studies per day. For high schools, the Revised Guidelines incorporate by reference Section 100.5 of the Commissioner's regulations, which also generally require more than three hours per day of secular studies. *See* 8 N.Y.C.R.R. §§ 100.1(a), 100.5; New York State Department of Education, "Guidance on New York Diploma Requirements," http://www.nysed.gov/common/nysed/files/programs/curriculum-instruction/currentdiplomarequirements2.pdf. These course requirements "may be met by incorporating, or integrating, the State learning standards" into other courses. Although the Revised Guidelines do not say so explicitly, this would permit private schools to integrate secular subjects into religious classes, provided that the school meets all unit of study requirements and provides students with instruction that enables them to achieve State learning standards.

Critically, these requirements, including the specific curriculum and hours requirements set forth in the Toolkit appendices, are identical for all private schools in the state, *regardless of whether they are covered by the Felder Amendment*. Indeed, there are only two respects in which the Revised Guidelines differentiate between covered and non-covered schools. First, per paragraph (v) of the Felder Amendment, N.Y. Educ. L § 3204(2)(v), substantial equivalence is determined by NYSED for covered schools, albeit with an initial review and "recommendation" by local school authorities, which NYSED may in its discretion accept or reject. Second, for covered schools, NYSED is required to consider the educational standards imposed by the Felder Amendment—*i.e.*, whether "curriculum provides academically rigorous instruction that develops critical thinking skills in the school's students," "taking into account the entirety of the curriculum," *id.* § 3204(2)(ii), (iii), and whether the Felder Amendment's learning standards in English, mathematics, history and science are being provided in covered elementary and middle schools, *id.* § 3204(2)(ii)—but these factors are *supplemental to*, rather than *in lieu of*, the more detailed course and hour requirements applicable to (both covered and non-covered) private schools.

The great irony, therefore, is that even though YAFFED alleges that the Felder Amendment was designed to reduce the amount of secular education provided at Hasidic yeshivas, it may have precisely the opposite effect. As mentioned previously, the Felder Amendment is drafted permissively and affords NYSED great discretion in imposing curricular standards supplemental to what is set forth in the statute. By promulgating the Revised Guidelines, the Commissioner has exercised that discretion to require covered schools to comply with all of the same curriculum and hour requirements applicable to other private schools, *plus* the skill sets enumerated in the Felder Amendment. However, despite the positions it has taken

elsewhere,[11] YAFFED has not sought leave to amend its complaint, and it continues to seek an injunction against enforcement of the Felder Amendment and NYSED's guidelines, arguing that the Felder Amendment reflects an unconstitutional preference for Hasidic Jewish schools vis-à-vis other schools.

## DISCUSSION

## I.

Legal formalities aside, it is apparent that the real question in this case is how to balance two competing values, both of which must be cherished in a free and democratic society, but either one of which, if allowed to expand to its logical conclusion, would swallow the other.

On one side is the right of every child to a sound basic education, the actualization of which "is perhaps the most important function of state and local governments." *Brown v. Board of Ed. of Topeka, Shawnee County, Kan.*, 347 U.S. 483, 493 (1954) ("Today [education] is a principal instrument in awakening the child to cultural values, in preparing him [or her] for later professional training, and in helping him [or her] to adjust normally to his [or her] environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he [or she] is denied the opportunity of an education"). It is often said that the importance of an education is to prepare one for civic engagement. Far more compelling than these collective

---

[11] Since the publication of the Revised Guidelines, YAFFED and its Executive Director have issued statements defending NYSED and the Revised Guidelines from criticism. *See* Naftuli Moster, "The Truth About the Struggle For Secular Education in Yeshivas," *Medium*, Jan. 6, 2019, https://medium.com/@Yaffedorg/the-truth-about-the-struggle-for-secular-education-in-yeshivas-67c7f3f4a32c; Naftuli Moster, "Statement Regarding New York State 'Substantial Equivalency' Guidelines," *Medium*, Dec. 13, 2018, https://medium.com/@Yaffedorg/statement-regarding-new-york-state-substantial-equivalency-guidelines-e331006f6aef; YAFFED (@yaffedorg), Twitter (Dec. 28, 2018, 8:10 a.m.) ("At the moment it looks like Albany [is] doing the right thing. Commissioner Elia has been called the harshest names by some Yeshivas leaders . . . . Yet she appears to be holding her ground."), https://twitter.com/yaffedorg/status/1078684603811012609.

interests, however, is the importance of education for the liberty of the *individual*. Simply put, one who enters adulthood without a sound basic education is not fully free to pursue their loftiest ambitions or to chart their own future. Circumstance has charted it for them. *See Plyler v. Doe*, 457 U.S. 202, 222 (1982) ("The inability to read and write will handicap the individual deprived of a basic education each and every day of his [or her] life"); *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 112 (1973) (Marshall, J., dissenting) ("Education directly affects the ability of a child to exercise his [or her] First Amendment rights, both as a source and as a receiver of information and ideas, whatever interests he [or she] may pursue in life"). It was this nexus between education and individual liberty that moved Justice White to observe that "[a] State has a legitimate interest not only in seeking to develop the latent talents of its children but also in seeking to prepare them for the life style that they may later choose, or at least to provide them with an option other than the life they have led in the past." *Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972) (White, J., concurring). Accordingly, States have a compelling interest in prescribing minimum requirements for the curricula provided at private schools within their jurisdiction. *See Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971); *Board of Ed. of Central School Dist. No. 1 v. Allen*, 392 U.S. 236, 245-246 and n. 7 (1968); *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923); *New Life Baptist Church Academy v. Town of East Longmeadow*, 885 F.2d 940, 944-945 (1st Cir. 1989) (Breyer, J.), *cert. denied*, 494 U.S. 1066 (1990).

These interests must be balanced, however, with the liberty of a parent under the Free Exercise and Due Process Clauses to direct their child's education in a manner that safeguards their cultural, religious and linguistic identity. *See Yoder, supra*; *Pierce*, 268 U.S. at 534-535; *Meyer*, 262 U.S. at 399-402. "The child is not the mere creature of the state; those who nurture

him [or her] and direct his [or her] destiny have the right, coupled with the high duty, to recognize and prepare him [or her] for additional obligations." *Pierce,* 268 U.S. at 535. So important is the right of a parent to oversee and participate in their child's educational process that the Supreme Court has elevated it to special status, withdrawing it from the general rule, applicable in nearly every other Free Exercise case, "that an individual's religious beliefs [do not] excuse him [or her] from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 878-879, 881 (1990). It is not difficult to harmonize this right with others relating to parental and procreational privacy, *see generally Obergefell v. Hodges,* 135 S. Ct. 2584, 2600 (2015); *U.S. v. Windsor,* 570 U.S. 744, 772 (2013); *Roe v. Wade,* 410 U.S. 113, 154 (1973); *Eisenstadt v. Baird,* 405 U.S. 438, 453 (1972); *Griswold v. Connecticut,* 381 U.S. at 479, 485-486 (1965); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 541 (1942), "a right of privacy older than the Bill of Rights," "older than our political parties," and certainly "older than our school system." *Griswold,* 381 U.S. at 486.

The moment at which one of these weighty interests must yield to the other cannot be identified with mathematical precision. The classical approach of the law has been to develop a dizzying series of 'tests,' 'prongs' and 'factors,' stitched together over the course of decades, resting on "distinctions that would glaze the minds of medieval scholastics." Leonard W. Levy, *The Establishment Clause: Religion and the First Amendment* 155 (2d ed. 1994). But an excess of legal formalism when confronting such ancient questions risks wrenching the law from the intuition and common sense of man. In the final analysis, it may fall on the political branches of government, rather than an unelected judiciary, to discover the appropriate compromise.

Echoed in all of this are First Amendment questions that are not altogether settled. On the one hand, it is sometimes said that the Establishment Clause "mandates government neutrality between religion and religion, and between religion and nonreligion." *Epperson v. State of Ark.*, 393 U.S. 97, 104 (1968); *see also Everson v. Board of Ed. of Ewing Tp.*, 330 U.S. 1, 18 (1947) ("Neither a state nor the Federal Government ... can pass laws which aid one religion, aid all religions, or prefer one religion over another"). On the other hand, "[a] law that is religio[usly] neutral on its face or in its purpose may *lack* neutrality in its effect by forbidding something that religion requires or requiring something that religion forbids," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 561 (1993) (Souter, J., concurring) (emphasis added), which may render some accommodation necessary under the Free Exercise Clause, *see Yoder*, *supra*; *Children's Healthcare is a Legal Duty, Inc. v. Vladeck*, 938 F.Supp. 1466, 1476 (D. Minn. 1996); *but see Smith*, 494 U.S. at 878-882. Between those accommodations forbidden by the Establishment Clause and those mandated by the Free Exercise Clause, "there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference. " *Walz v. Tax Commission of City of New York*, 397 U.S. 664, 669 (1970); *see also Cutter v. Wilkinson*, 544 U.S. 709 (2005); *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 483 U.S. 327, 334-335 (1987).

But this 'play in the joints' must be reconciled with "[t]he clearest command of the Establishment Clause ... that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Because accommodations that favor only one religion do not advance the State's interest in religious liberty generally, *see Board of Educ. of Kiryas Joel Village School Dist. v. Grumet*, 512 U.S. 687, 714-716 (1994) (O'Connor, J.,

concurring), the government may not accommodate the needs of some religions without extending similar accommodations to other religions, *see Cutter*, 544 U.S. at 720; *Amos*, 483 U.S. at 338-339, unless doing so is "justified by a compelling governmental interest" and the accommodation is "closely fitted to further that interest," *Larson*, 456 U.S. at 247. While courts have generally found such accommodations unconstitutional where they favor specific religious sects, *see Kiryas Joel*, 512 U.S. at 702-705; *Colorado Christian University v. Weaver*, 534 F.3d 1245, 1266-1269 (10th Cir. 2008); *Wilson v. N.L.R.B.*, 920 F.2d 1282, 1287-1288 (6th Cir. 1990), *cert. denied*, 505 U.S. 1218 (1992); *Vladeck*, 938 F.Supp. at 1479, the contours of *Larson*'s strict scrutiny test remain unclear, *see Kiryas Joel*, 512 U.S. at 722-727 (Kennedy, J., concurring); Jeremy Patrick-Justice, *Strict Scrutiny for Denominational Preferences: Larson in Retrospect*, 8 N.Y. City L. Rev. 53 (2005).

The Court's intention in alluding to these questions is not to resolve them, but to note only that they are profoundly difficult. It is precisely in cases like this that the Court should be wary of forging ahead unless it is clear that the controversy is a live one, rather than an abstract disagreement about what the Constitution does or does not permit. "From the earliest days of the Republic it has been recognized that [courts are] without power to give advisory opinions." *Larson*, 456 U.S. at 264 (Rehnquist, J, dissenting) (citations and quotation marks omitted). "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable. " *Regents of University of California v. Bakke*, 438 U.S. 265, 411 (1978) (quoting *Spector Motor Service v. McLaughlin*, 323 U.S. 101, 105 (1944)); *see also Spector Motor Service v. Walsh*, 139 F.2d 809, 823 (2d Cir. 1943) (Hand, J., dissenting) ("Nor is it desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine

which may be in the womb of time, but whose birth is distant"). "The more important the issue, the more force there is to this doctrine." *Bakke*, 438 U.S. at 411-412. "Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997).

These prudential considerations are a powerful argument in favor of enforcing the Article III standing requirement rigorously. *See Poe v. Ullman*, 367 U.S. 497, 503-504 (1961) ("The various doctrines of 'standing,' 'ripeness,' and 'mootness' ... are but several manifestations— each having its own 'varied application'—of the primary conception that federal judicial power is to be exercised to strike down legislation, whether state or federal, only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action") (footnotes omitted). The requirement that constitutional challenges be brought by the right plaintiff, at the right time, ensures that they come to the Court with a complete factual record, so that the Court does not decide the matter based on fears that do not come to pass. *See* Charles Alan Wright, *et al.*, 13 Fed. Prac. & Proc. Juris. § 3531.3 (3d ed.) (standing requirements "mean postponement of judicial review until passions have cooled and there has been some opportunity for evaluation of a challenged program in practice") (citing Lee A. Albert, *Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief*, 83 Yale L. J. 425, 488 (1974)).

Therefore, the Court will turn to whether YAFFED has adequately demonstrated Article III standing.

## II.

Because a plaintiff's standing goes to the subject matter jurisdiction of the Court, the appropriate vehicle to dismiss a cause of action for lack of standing is Federal Rule of Civil Procedure 12(b)(1). *See Cortlandt Street Recovery Corp. v. Hellas Telecommunications, S.a.r.l.*, 790 F.3d 411, 416-417 (2d Cir. 2015). In adjudicating a Rule 12(b)(1) motion, the Court is not limited to the pleadings, but may instead consider all evidentiary material bearing on whether it has subject matter jurisdiction. *See Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986) ("[W]hen, as here, subject matter jurisdiction is challenged under Rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise"). Consideration of such extrinsic materials does not convert the Rule 12(b)(1) motion into a motion for summary judgment, as would be the case for a motion under Rule 12(b)(6) or 12(c). *See id.; cf.* Fed. R. Civ. P. 12(d).

## III.

The requirements for standing are well-settled. An organization may sue "in its own right" to "vindicate whatever rights and immunities the [organization] itself may enjoy." *New York Civil Liberties Union v. New York City Transit Authority*, 684 F.3d 286, 294 (2d Cir. 2012) (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).[12] The requirements for organizational standing are the same as those for an individual plaintiff: the "plaintiff must demonstrate [(1)] an 'actual and imminent, not conjectural or hypothetical' threat of a 'concrete and particularized' injury in fact [(2)] that is 'fairly traceable to the challenged action of the defendant' and that [(3)] 'a favorable judicial decision will likely prevent or redress.' " *Id.* (quoting *Summers v. Earth*

---

[12] Although organizations may also sue on behalf of their members based on a theory of 'associational standing', *see New York Civil Liberties Union*, 684 F.3d at 294, the Second Circuit has interpreted 42 U.S.C. § 1983 to preclude associational standing in § 1983 cases. *See League of Women Voters of Nassau County v. Nassau Board of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984); *Aguayo v. Richardson*, 473 F.2d 1090, 1099 (2d Cir. 1974); *but see Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 122-124 (2d Cir. 2017) (Jacobs, J., dissenting) (questioning that analysis).

*Island Inst.*, 555 U.S. 488, 493 (2009)); *see also Lujan*, 504 U.S. at 560-561. "To establish standing for an injunction, a plaintiff must not merely allege past injury, but also a risk of future harm." *Access 4 All, Inc. v. Trump Intern. Hotel and Tower Condominium*, 458 F.Supp.2d 160, 167 (S.D.N.Y. 2006) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102, 105 (1983)). Here, it is the first of these factors—whether YAFFED has established an injury in fact—that occupies our standing analysis.

Naftuli Moster, YAFFED's founder and Executive Director, describes the purpose of YAFFED as advocating for the improvement of "secular education in the Orthodox Jewish community, in particular in the Hasidic community," which YAFFED believes "must include a real and substantial secular component." (Moster Decl. ¶¶ 5-6). YAFFED's primary goal before the enactment of the Felder Amendment was to bring Hasidic schools into compliance with the Education Law's substantial equivalence mandate. These efforts have included lobbying State and local officials for greater oversight, direct outreach aimed at the Hasidic community, and educating the larger public about the issue. (Moster Decl. ¶¶ 7-9). YAFFED also engages in other efforts, including compiling and publishing data on Hasidic education, providing resources and referrals to members of the Hasidic community seeking a secular education for themselves or their children, and publishing a Yiddish newsletter about the importance of secular education that reaches almost 20,000 Hasidic homes. (Moster Decl. ¶¶ 10-11).

YAFFED primarily argues that it has standing because it has spent significant effort opposing the Amendment, both in this Court and through other avenues, and thereby "shift[ed] valuable resources away from its traditional advocacy and education efforts." (Compl. ¶ 92; Moster Decl. ¶¶ 52-58). However, if the Court were to accept this argument, it would be difficult to conceive of a case in which an organization or individual would *not* have standing to

challenge a statute that they find politically or socially disagreeable. "Individual persons cannot obtain judicial review of otherwise non-justiciable claims simply by incorporating, drafting a mission statement, and then suing on behalf of the newly formed and extremely interested organization." *National Treasury Employees Union v. U.S.*, 101 F.3d 1423, 1429 (D.C. Cir. 1996). If any plaintiff with a strong objection to a statute could manufacture standing by spending time and money opposing that very statute—and then arguing that the expenditure of that time and money was itself an injury—there would be no real constraint upon standing at all, except perhaps the size of the plaintiff's bank account. This would conflict with the Supreme Court's admonition that the federal judiciary not be converted into "publicly funded forums for the ventilation of public grievances." *Valley Forge*, 454 U.S. at 473 ("[T]he 'cases and controversies' language of Art. III forecloses the conversion of courts of the United States into judicial versions of college debating forums"); *see also Federal Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) ("[A]bstract" harm, such as "injury to the interest in seeing that the law is obeyed," lacks "the concrete specificity" necessary for standing); *Lujan*, 504 U.S. at 573-574 ("We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy"). Here, "[i]t is evident that [Plaintiff] [is] firmly committed to the constitutional principle of separation of church and State, but standing is not measured by the intensity of the litigant's interest or the fervor of his [or her] advocacy." *Valley Forge,* 454 U.S. at 486.

YAFFED argues that its diversion-of-resources theory finds support in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982). In *Havens*, the Supreme Court held that Housing

Opportunities Made Equal ("HOME"), a civil rights organization "whose purpose was 'to make equal opportunity in housing a reality in the Richmond Metropolitan Area,' " had standing to sue under the Fair Housing Act of 1968 on the theory that the defendants forced HOME to "devote significant resources to identify and counteract the [defendants'] racially discriminatory steering practices." 455 U.S. at 368, 378. HOME alleged that these expenditures detracted from its ability to carry out its day-to-day work, including "counseling and referral services for low- and moderate-income homeseekers . . . ." *Id.* at 379. The Court held that "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources," constituted an injury in fact rather than "simply a setback to the organization's abstract social interests." *Id.*

However, the critical difference between *Havens* and this case is that, in *Havens,* HOME sought only damages for past expenses. *See id.* at 378. Here, by contrast, YAFFED seeks *prospective* relief against enforcement of a government policy. Therefore, this case raises a concern that was absent in *Havens*, namely, the prospect that a citizen with a generalized grievance might manufacture standing in order to enjoin conduct that they object to as a public policy matter. *See Fair Elections Ohio v. Husted,* 770 F.3d 456, 460 n. 1 (6th Cir. 2014) (holding that voter outreach organization lacked standing to challenge absentee ballot procedures and distinguishing *Havens* on grounds that, *inter alia,* the *Havens* plaintiff sought only damages).

YAFFED also cites to a bevy of Second Circuit precedents which, it claims, support its diversion-of-resources theory even in the context of prospective relief. *See Centro de la Comunidad, supra; Mental Disability Law Clinic, Touro Law Center v. Hogan,* 519 Fed.Appx. 714 (2d Cir. 2013) (summary order); *Nnebe v. Daus,* 644 F.3d 147 (2d Cir. 2011); *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898 (2d Cir. 1993). But none of these cases support

YAFFED's theory of standing because the organizational plaintiffs in these cases did not engage in mere advocacy, but instead provided social services directly to the group harmed by the challenged government policy. In *Centro de la Comunidad*, the Court held that a group dedicated to organizing day laborers had standing to challenge an anti-solicitation ordinance that physically made it more difficult for the group's members to meet with day laborers, exposed its members to a risk of mistaken arrest, and forced the group to expend resources responding to the ordinance. *See* 868 F.3d at 110-111. In *Mental Health Disability Law Clinic*, the Court held that a legal clinic had standing to challenge a policy of the New York State Office of Mental Health ("OMH") that would allegedly result in "[p]ervasive and systemic violations" against the mentally disabled, *Brown v. Stone*, 66 F.Supp.2d 412, 425 (E.D.N.Y. 1999), which required the clinic to divert resources away from its normal activities by challenging the OMH policy itself. *See Mental Health Disability Law Clinic*, 519 Fed.Appx. at 717. In *Nnebe*, the Court held that a taxi workers' association had standing to challenge the Taxi and Limousine Commission's suspension procedures, which would have required the association to spend resources counseling adversely affected drivers. *See* 644 F.3d at 157-158. In *Ragin*, the Court addressed facts largely similar to *Havens*, with the important difference that the organizational plaintiff sought injunctive relief. The Court held that the organization's efforts identifying and counteracting the defendant's discriminatory conduct diverted its resources away from its usual activities and therefore qualified as an injury in fact. *See* 6 F.3d at 905.

At most, these cases stand for the proposition that an organization that provides social services, such as counseling, referrals and legal advocacy, suffers a cognizable injury in fact where the defendant's conduct, if allowed to persist, would either raise the cost of providing those services, *see Centro de la Comunidad*, 868 F.3d at 110-111; *Nnebe*, 644 F.3d at 157-158,

or require the plaintiff to divert resources away from its normal operations to mitigate the adverse effects of the defendant's conduct, thereby reducing the total quantity of services that it can provide, *see Centro de la Comunidad*, 868 F.3d at 110-111; *Mental Health Disability Law Clinic*, 519 Fed. Appx. at 717; *Ragin*, 6 F.3d at 905; *see also See Common Cause/New York v. Brehm*, -- F.Supp.3d --, 2018 WL 4757955, at \*3-\*5 (S.D.N.Y. Sept. 30, 2018) (organization devoted to registering and mobilizing voters could challenge New York's procedures for placing voters on inactive status, where those procedures required the organization to spend time assisting affected voters); *New York State Citizens' Coalition for Children v. Velez*, 2016 WL 11263164, at \*5 (E.D.N.Y. Nov. 7, 2016) (organization that supports and counsels foster parents had standing to challenge State's reimbursement rate to foster parents, where organization had to spend 100 hours per week responding to telephone calls from foster parents frustrated about inadequate rates), report and recommendation adopted, 2017 WL 4402461 (E.D.N.Y. Sept. 29, 2017); *cf. Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78 (3d Cir. 1998) (finding a lack of standing where "[t]he record [did] not establish that the [plaintiff] altered its operations in any way as a result of the allegedly discriminatory advertisements or diverted any of its resources to a bona fide investigation"); *Mental Hygiene Legal Service v. Cuomo*, 13 F.Supp.3d 289, 299 (S.D.N.Y. 2014) (finding a lack of standing where plaintiff "ha[d] not indicated that its activities [opposing the law] detracted the attention of [its] staff members from their regular tasks").

By contrast, courts have been reluctant to extend this doctrine to organizations engaged primarily in social advocacy. This reluctance is grounded in language from *Havens* itself, which recognized that standing cannot be asserted based on a mere "setback to the organization's abstract social interests." 455 U.S. at 379.

Hence, in *Citizens for Responsibility and Ethics in Washington v. Trump* ("*CREW*"), 276 F.Supp.3d 174 (S.D.N.Y. 2017), the district court held that Citizens for Responsibility and Ethics in Washington ("CREW"), a non-profit organization whose self-proclaimed mission was to "protect the rights of citizens to be informed about the activities of government officials, ensure the integrity of government officials, protect the political system against corruption, and reduce the influence of money in politics," *id.* at 180 (alterations omitted), did not have standing to seek declaratory and injunctive relief against the President of the United States for violations of the Emoluments Clause. Unlike the organizational plaintiffs in the above-mentioned cases, CREW did not provide legal or social services to anyone. Rather, the organization's work involved "research, advocacy, litigation, and education, all aimed at raising public awareness about the influence of outside special interests on public officials." *Id.* The court rejected CREW's argument that it had incurred an injury by "devot[ing] significant resources to identify and counteract [the President's] alleged violations of the Emoluments Clauses, including through the use of 'every member of CREW's research team on a near-daily basis' and 'the hiring of two additional senior attorneys,' as well as its efforts to explain the alleged violations to stakeholders, including the press, and assist and counsel others in counteracting [the President's] alleged violations." *Id.* at 189. As the court explained:

> ... CREW's entire reason for being is to investigate and combat corruption and reduce the influence of money in politics through, among other things, education, advocacy, and litigation. CREW is thus not wasting resources by educating the public and issuing statements concerning the effects of [the President's] alleged constitutional violations or even by filing suit; this is exactly *how* an organization like CREW spends its resources in the ordinary course.

*Id.* at 191-192.

Similarly, in *Center for Food Safety v. Price*, 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018), the district court held that organizations whose missions included "protecting people from eating unsafe food and ensuring food safety and the integrity of the food system" lacked standing to challenge regulations promulgated by the Food and Drug Administration ("FDA") that would allegedly weaken FDA's ability to oversee the safety of food additives. The court held that, to the extent the organization diverted resources to counteracting the regulation at issue, "[t]hese purported injuries are not sufficiently distinct from the general mission of the organizations at issue. . . . . [T]o allow standing based on these allegations alone would mean that any entity that spends money on an issue of particular interest to it would have standing, which would in turn contravene the principle that an entity's 'mere interest in a problem' cannot support standing." *Id.* at *5 (quoting *Sierra Club*, 405 U.S. at 739).

In *National Congress for Puerto Rican Rights* ("*NCPRR*"), *v. City of New York*, 75 F.Supp.2d 154 (S.D.N.Y. 1999), the district court held that a civil rights group that "expends substantial resources at the city, state and national levels to advocate reforms to end police misconduct," *id.* at 159, could not sue on its own behalf to challenge New York City's stop-and-frisk practices. Importantly, there was no claim that the organization provided direct services, such as referrals or reimbursement of legal expenses, to or on behalf of people subject to racial discrimination. *See id.* at 165. Rather, its "interest in ending the unconstitutional practices of the [street crime unit] [was] a generalized concern related to its abstract social interest in eliminating discrimination against Puerto Ricans." *Id.*

These cases are consistent with the prevailing rule in the District of Columbia Circuit, which hears numerous challenges to federal power by interested lobbying groups and therefore may be regarded as a persuasive authority in this area of law. *See Center for Law and Educ. v.*

*Department of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005) (holding that advocacy groups

lacked standing to challenge the composition of a Department of Education rulemaking

committee where "the only 'service' impaired is pure issue-advocacy—the very type of activity

distinguished by *Havens*"); *National Taxpayers Union, Inc. v. U.S.*, 68 F.3d 1428, 1434 (D.C.

Cir. 1995) ("The impact of Section 13208 upon [plaintiff's] programs, such as its educational

and legislative initiatives, also does not constitute an injury in fact."); *Environmental Working*

*Group v. United States Food and Drug Administration*, 301 F.Supp.3d 165, 172 (D.D.C. 2018)

("But injuries to an organization's government lobbying and issue advocacy programs cannot be

used to manufacture standing, because that would allow lobbyists on either side of virtually any

issue to take the Government to court"). In *American Soc. for Prevention of Cruelty to Animals*

*v. Feld Entertainment, Inc.*, 659 F.3d 13, 26-27 (D.C. Cir. 2011), the District of Columbia

Circuit questioned, in *dicta*, its previous statement in *Center for Law & Education* that

impairments to "pure issue-advocacy" cannot constitute an injury in fact. However, more recent

decisions by the District of Columbia Circuit have reaffirmed the bar against standing based on

"pure issue-advocacy." *Electronic Privacy Information Center v. Federal Aviation*

*Administration*, 892 F.3d 1249, 1255 (D.C. Cir. 2018); *People for the Ethical Treatment of*

*Animals v. U.S. Dept. of Agriculture*, 797 F.3d 1087, 1094 (D.C. Cir. 2015); *National Ass'n of*

*Home Builders v. E.P.A.*, 667 F.3d 6, 12 (D.C. Cir. 2011).

      In sum, the law recognizes that organizations engaged in providing social services have a

meaningful interest in their ability to carry on that work. Accordingly, the appropriate standing

inquiry is whether the challenged state law, because of its detrimental effect on the community

served by the organization (or upon the organization itself), will require the organization to

devote resources remediating the law's harmful effects in a way that limits its ability to provide

the same level of services as before. If so, the organization's institutional mission has been harmed. By contrast, an organization whose primary endeavor is to change or enforce the law, whether by communicating directly with government officials, community leaders, or the public, occupies no position different from that of a concerned citizen. And whatever else may be said of the standing doctrine, it clearly forbids citizen suits. While the distinction between social services and political activism may sometimes appear tenuous, *see American Soc. for Prevention of Cruelty to Animals*, 659 F.3d at 27, it is also the most rational way to reconcile our precedents within the clear limitations that the Supreme Court has placed on Article III standing.

Here, YAFFED's arguments for standing are almost indistinguishable from those unsuccessfully asserted in *Center for Food Safety, CREW* and *NCPRR, supra*. As stated in the complaint:

> Over the past 6 years, YAFFED has zealously advocated for yeshiva students' right to education. YAFFED's work includes advocacy aimed at both New York State and New York City officials, outreach efforts aimed at the Hasidic community, and education efforts aimed at raising awareness of the issue with the general public.
> ...
> The Felder Amendment has ... forced YAFFED to shift valuable resources away from its traditional advocacy and education efforts. Instead of advocating that the state and city enforce the laws requiring a substantially equivalent education, YAFFED has had to focus now on advocating in opposition to the Felder Amendment and to have the Felder Amendment declared unconstitutional.

(Compl. ¶¶ 16, 92). YAFFED's complaint and supporting materials contain repeated references to YAFFED's advocacy mission and to the fact that the Felder Amendment will simply require it to shift its message. (Compl. ¶ 18 ("YAFFED is an *advocacy* group committed to improving educational curricula within ultra-Orthodox schools"); ¶ 52 ("YAFFED's work includes *advocacy* aimed at both New York State and New York City officials, outreach efforts aimed at the Hasidic community, and education efforts aimed at raising awareness of the issue with the

general public"); ¶ 53 ("For the first few years, YAFFED's *advocacy* efforts went ignored by NYSED and the NYCDoE. ... In July 2015, however, YAFFED's *advocacy* began to bear fruit"); ¶ 56 ("YAFFED has also educated State officials ... and *advocated* for laws or regulations . . . ."); *id.* ("YAFFED's *advocacy* efforts resulted in two bills filed in the New York State Legislature"); ¶ 60 ("YAFFED's many attempts at educating and *advocating* to fix substandard education at Hasidic yeshivas has been time consuming and costly. From its founding in 2012 through April 2018, YAFFED has spent significant resources in furtherance of its *advocacy*"); ¶ 10 (guidelines based on the Felder Amendment "will require additional and different *advocacy*, strategies, and methods by YAFFED to combat the relaxed standards now recited in the Felder Amendment"); ¶ 91 ("The Felder Amendment has and will impact YAFFED's *advocacy*, potentially rendering moot some of its work over the past six years"); ¶ 101 ("Plaintiff ... will be required to permanently shift [the] focus of [its] *advocacy* and completely recreate [its] reform efforts")) (emphasis added).

Although Moster's declaration contains a passing reference to direct services, including referrals and resources for members of the Hasidic community interested in getting a secular education (Moster Decl. ¶ 11), YAFFED has not claimed in the complaint or in any of its supporting materials that its ability to provide these services has been impacted by the Felder Amendment. *See Fair Housing Council of Suburban Philadelphia*, 141 F.3d at 78; *Mental Hygiene Legal Service*, 13 F.Supp.3d at 299; *cf. Ragin*, 6 F.3d at 905.

YAFFED also claims that the Amendment has impaired its fundraising ability, harmed its reputation, dampened enthusiasm for its cause, and forced it to take precautions after at least one death threat against Moster. (Moster Decl. ¶¶ 57-58, 60).[13] This type of harm might qualify as an

---

[13] It goes without saying that this Court condemns any threats of violence against YAFFED.

injury in fact, at least where the organization is directly targeted by a state action or policy. *See Irish Lesbian and Gay Organization v. Giuliani*, 143 F.3d 638, 650-651 (2d Cir. 1998). In this case, however, YAFFED has not convincingly explained how these injuries are fairly traceable to the Felder Amendment or how they would be redressed if it were declared void. *See Taylor v. Bernanke*, 2013 WL 4811222, at *12 (E.D.N.Y. Sept. 9, 2013) (plaintiffs affiliated with "Occupy" movement lacked standing to challenge delay in issuing joint final rulemaking under the Volcker Rule; plaintiffs argued that "the delay has frustrated [their] advocacy efforts because, as time passes, 'the Occupy movement' has 'lost momentum and public visibility' and will find it harder to garner public support for enforcing strict bank compliance with the Volcker Rule").

Accordingly, the Court is driven to conclude that YAFFED lacks standing.

## IV.

YAFFED lacks standing for the additional reason that its claims are constitutionally unripe.

"[T]he best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing. ... [T]o say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.' " *National Organization for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) (quoting *Lujan*, 504 U.S. at 560); *see also Bronx Household of Faith v. Board of Educ. of City of New York*, 492 F.3d 89, 111 (2d Cir. 2007) (Leval, J., concurring) ("The concept of ripeness assumes that the relationship between the parties might at some point ripen into an injury sufficiently direct and realized to satisfy the requirements of Article III standing. It recognizes, however, that some disputes mature in stages, going through preliminary phases

during which the injury is as yet but a speculative possibility, too remote or hypothetical to warrant present submission to a federal court.").[14]

The Second Circuit has held that an organization asserting standing based on a diversion-of-resources theory "must show that both the anticipated expenditures and ensuing harm to their organizations' activities are 'certainly impending.' " *Knife Rights*, 802 F.3d at 389 (quoting *Clapper*, 568 U.S. at 409); *accord Aleksanian v. Cuomo*, 2017 WL 2881134, at *4 (E.D.N.Y. Jul. 6, 2017); *see also Clapper*, 568 U.S. at 416 ("[plaintiffs] cannot manufacture standing merely by

---

[14] Constitutional ripeness should be distinguished from prudential ripeness:

> "Constitutional ripeness is a doctrine that, like standing, is a limitation on the power of the judiciary. It prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it. But when a court declares that a case is not prudentially ripe, it means that the case will be *better* decided later and that the parties will not have constitutional rights undermined by the delay. It does not mean that the case is not a real or concrete dispute affecting cognizable current concerns of the parties within the meaning of Article III. ... Prudential ripeness is, then, a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial."

*National Organization for Marriage*, 714 F.3d at 668 (quoting *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003)).

In *Susan B. Anthony List v. Dreihaus*, a unanimous Supreme Court cast serious doubt as to whether a court may decline to hear a case on 'prudential' ripeness grounds. *See* 573 U.S. 149, 167 (2014) ("To the extent respondents would have us deem petitioners' claims nonjusticiable 'on grounds that are "prudential," rather than constitutional,' '[t]hat request is in some tension with our recent reaffirmation of the principle that "a federal court's obligation to hear and decide" cases within its jurisdiction "is virtually unflagging" ' ") (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-126 (2014)).

Because the Court holds that YAFFED lacks standing, it need not dwell on the issue of prudential ripeness.

inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").[15] While this standard is necessarily inexact, courts are "inclined to find standing" if it can be said that " 'there is no better time' to resolve the issues raised by the parties—that is, when they 'will be in no better position later than now.' " *Brooklyn Center for Independence of the Disabled v. Bloomberg*, 290 F.R.D. 409, 415 (S.D.N.Y. 2012) (quoting *Alliance of American Insurers v. Cuomo*, 854 F.2d 591, 599 (2d Cir. 1988)). Such is not the case here.

YAFFED's diversion-of-resources argument, to the extent it has any merit, must be grounded in the prospect that the Felder Amendment will ultimately result in Hasidic yeshivas offering a substandard secular education, compared to the instruction that they would offer if the Felder Amendment were declared void. After all, it is YAFFED's mission—"to ensure that all students within the ultra-Orthodox community receive the critical tools and skill sets needed for long-term personal growth and self-sufficient futures"—that the Felder Amendment is alleged to

---

[15] By contrast, where the plaintiff is a member of the class whose liberty may directly be threatened by enforcement of the statute, a more "relaxed" standard applies to pre-enforcement suits. *National Organization for Marriage*, 714 F.3d at 689; *see also Susan B. Anthony List*, 573 U.S. at 164-167 (finding that plaintiff had standing based on a "substantial" and "credible threat" that the statute would be enforced against them); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) ("credible threat of prosecution" sufficient). The reason for this more lenient standard is that, even if enforcement of the statute is not imminent, a credible threat of enforcement might chill the plaintiff's constitutionally-protected conduct, and such chilling is itself a *present*, rather than future, injury. *See National Organization for Marriage*, 714 F.3d at 689 ("[W]ithout the possibility of pre-enforcement challenges, plaintiffs contesting statutes or regulations on First Amendment grounds 'face an unattractive set of options if they are barred from bringing a facial challenge': refraining from activity they believe the First Amendment protects, or risk[ing] civil or criminal penalties for violating the challenged law") (citing *Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 459 (11th Cir. 1996); *Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000) ("[T]he alleged danger of th[e] statute is, in large measure, one of self-censorship; a harm, that can be realized without an actual prosecution") (quoting *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)) (alterations in the original).

frustrate. (Compl. ¶ 15). However, as discussed above, the Felder Amendment by its terms does not require education officials to grant any such accommodation, and NYSED has issued guidelines which, for all intents and purposes, impose identical curriculum requirements on all private schools in the state, regardless of whether they are covered by the Felder Amendment. While the Revised Guidelines also require NYSED to consider the criteria set forth in the specific statutory text of the Felder Amendment when evaluating covered schools, this requirement would, if anything, subject those schools to a *higher* standard than non-covered schools. There is no indication that covered schools that fall short of the specific course and hour requirements in the Revised Guideline Toolkits will be deemed to comply with the substantial equivalence requirement so long as they meet the more relaxed Felder Amendment standards.

What YAFFED essentially seeks is an advisory opinion as to the constitutionality of the Felder Amendment, based on the possibility that NYSED might, in the future, apply it in a manner that disadvantages students at Hasidic yeshivas. But this injury lacks the concreteness and immediacy required for standing under Article III, *see Knife Rights*, 802 F.3d at 389, particularly in light of our judicial "policy of strict necessity in disposing of constitutional issues," *Rescue Army v. Municipal Court of City of Los Angeles*, 331 U.S. 549, 568 (1947).

Accordingly, the Court holds that YAFFED's claim is constitutionally unripe.

## V.

The dismissal of the action for lack of standing, and thus lack of a case or controversy, the "irreducible constitutional minimum" required by Article III of the Constitution, *Lujan*, 504 U.S. at 560, renders this Court without subject matter jurisdiction to address the other momentous issues that inhere in this case. For that reason, the Court denies YAFFED's motion for a preliminary injunction, and does not consider whether YAFFED would be likely to prevail

on its claim that the Felder Amendment infringes upon the Establishment Clause of the First Amendment, or whether, as the PEARLS Amici argue, the Felder Amendment is a necessary accommodation of religion under the Free Exercise and Due Process Clauses. The Court has no occasion to address Defendants' alternative arguments for dismissal on prudential ripeness and Eleventh Amendment grounds.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss pursuant to Rule 12(b)(1) is **GRANTED**, and YAFFED's motion for a preliminary injunction is therefore **DENIED**.


SO ORDERED.

Dated:     Brooklyn, New York
           January 16, 2019

/s/   s/I. Leo Glasser, USDJ
I. Leo Glasser/           U.S.D.J.